408 S.E.2d 300

**Wilma J. PEAK and David C. Peak, Her Husband, Plaintiffs Below, Appellants,**

v.

**Jerold E. RATLIFF, Individually, and the West Virginia Department of Public Safety, etc., and David Brian Akers, Jointly and Severally, Defendants Below,**

**Jerold E. Ratliff, Individually, and the West Virginia Department of Public Safety, etc., Appellees,**

**David Brian Akers, Appellant.**

**No. 19905.**

Supreme Court of Appeals of West Virginia.

January 1991 Term.

Submitted May 8, 1991.

Decided July 16, 1991.

Anthony R. Veneri, Randall L. Veneri, Princeton, for appellants Wilma J. Peak and David C. Peak.

Thomas L. Berry, Princeton, for appellant David Brian Akers.

Steven P. McGowan, Susan C. Osenton, Steptoe & Johnson, Charleston, for appellees.

Marvin W. Masters, Masters & Taylor, L.C., Charleston, for amicus curiae West Va. Troopers' Ass'n.

MILLER, Chief Justice:

This case presents an issue of first impression in this jurisdiction—whether a police officer may be held liable for injuries sustained by an innocent third party when, in the course of a police pursuit, a law violator's motor vehicle collides with an automobile driven by the third party. By order dated September 20, 1990, the Circuit Court of Mercer County set aside a jury verdict in favor of the plaintiffs below, Wilma J. Peak and David C. Peak, her husband, for injuries sustained by Mrs. Peak when the car she was driving collided with a pickup truck driven by David Brian Akers. At the time, Mr. Akers was being pursued by members of the West Virginia Department of Public Safety (the Department).[1] The circuit court concluded that there was insufficient evidence to support the jury's finding of liability on the part of the police officers and entered a judgment notwithstanding the verdict in their favor.

The accident giving rise to this proceeding occurred in the late afternoon of September 15, 1987, near the intersection of State Route 19/33, also known as Glenwood Road, and U.S. Route 460 in Mercer County. Trooper Jerold E. Ratliff and Corporal Ralph Daniel Fulknier, members of the Department, were engaged in a high-speed vehicular pursuit of Mr. Akers, a burglary suspect who had previously eluded capture by the police, on Glenwood Road. As they approached the intersection with Route 460, the vehicle driven by Mr. Akers entered the oncoming lane of traffic and collided head-on with the car driven by Mrs. Peak, seriously injuring her. The po-

---

1. The Executive Reorganization Act of 1989 redesignated this body, commonly known as the State Police, as the Division of Public Safety and transferred it to the newly created Department of Public Safety, which now administers state military, emergency services, and corrections agencies. *See* W.Va.Code, 5F–1–1, *et seq. See also,* W.Va.Code 15–2–1 *et seq.* We use the term "the Department" throughout this opinion to refer to the entity now known as the Division of Public Safety.

lice vehicle driven by Trooper Ratliff was not involved in the collision.

On September 20, 1988, the plaintiffs instituted a civil action in the Circuit Court of Mercer County against Mr. Akers, Trooper Ratliff, and the Department. The complaint alleged that Trooper Ratliff was negligent and acted in reckless disregard of the safety of the public in initiating and continuing a high-speed pursuit of Mr. Akers and that such actions were the proximate cause of Mrs. Peak's injuries. Suit was brought against the Department on grounds of *respondeat superior*.[2] Mr. Akers filed a cross-claim on the same grounds, alleging that the fault of Trooper Ratliff and the Department equaled or exceeded his own.

On August 7, 1990, trial commenced on the issue of liability alone. Mr. Akers admitted fault. The defendants moved for directed verdicts at the close of the plaintiffs' case-in-chief and at the end of all the evidence. Both motions were denied. On August 9, 1990, the jury returned a verdict in favor of the plaintiffs, finding the Department, through Trooper Ratliff, guilty of acting in reckless disregard of the safety of Mrs. Peak. The jury allocated 80 percent of the fault to Mr. Akers and 20 percent to the Department.

On August 16, 1990, Trooper Ratliff and the Department filed with the court a motion for judgment notwithstanding the verdict, alleging that the evidence was insufficient to permit a finding that they had acted in reckless disregard of the safety of the public. By order dated September 20, 1990, the circuit court granted the motion. The plaintiffs and Mr. Akers now appeal from that order.

## I.

 The threshold issue on appeal is whether a cause of action exists against Trooper Ratliff and the Department. The plaintiffs recognize that their claims rest on an interpretation of our emergency vehicle statute, W.Va.Code, 17C–2–5 (1971). This statute permits the driver of an authorized emergency vehicle, including a police officer in vehicular pursuit of known or suspected lawbreakers, to disregard certain traffic regulations when responding to an emergency call with warning lights and/or sirens.[3] The statute also provides, however, that "[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive

---

2. It is uncontested that the Department had insurance coverage for the types of liability and loss alleged in the complaint. Accordingly, there is no allegation of immunity from suit pursuant to Article VI, Section 35 of the West Virginia Constitution. *See Pittsburgh Elevator Co. v. West Virginia Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983). Moreover, there is no issue raised as to the applicability of the Governmental Tort Claims and Insurance Reform Act, W.Va.Code, 29–12A–1, *et seq*.

3. W.Va.Code, 17C–2–5, provides:
 "(a) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.
 "(b) The driver of an authorized emergency vehicle may:
 "(1) Park or stand, irrespective of the provisions of this chapter;
 "(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
 "(3) Exceed the speed limits so long as he does not endanger life or property;
 "(4) Disregard regulations governing direction of movement of [or] turning in specified directions.
 "(c) The exemptions herein granted to an authorized emergency vehicle shall apply only when the driver of any said vehicle while in motion sounds audible signal by bell, siren, or exhaust whistle as may be reasonably necessary, and when the vehicle is equipped with at least one lighted flashing lamp as authorized by section twenty-six [§ 17C–15–26], article fifteen of this chapter which is visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle, except that an authorized emergency vehicle operated as a police vehicle need not be equipped with or display a warning light visible from in front of the vehicle.
 "(d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others." W.Va.Code, 17C-2-5(d).

This provision, which is common to the statutes of other states, appears to contain a dual standard of care. The provision states that the driver of an emergency vehicle has the "duty to drive with due regard for the safety of all persons," implying a negligence standard. However, this is followed by the statement that the driver is not protected "from the consequences of his reckless disregard for the safety of others." This language clearly suggests that the emergency driver is accountable only for reckless acts or gross negligence.[4]

Most courts which have considered emergency vehicle statutes similar to ours have not commented on this dichotomy. In *Thornton v. Shore*, 233 Kan. 737, 666 P.2d 655 (1983), the Kansas Supreme Court concluded that the "due care" requirement "applies exclusively to the operation of the emergency vehicle itself," and declined to apply the reckless disregard standard to a police officer who was sued after a vehicle he was pursuing crashed into a third vehicle, killing the occupants.[5] The court concluded that a police officer "is not liable, as a matter of law, for reckless and negligent acts committed by the fleeing law violator."[6] One of the dissenting justices pointed out that while the majority had recognized the provisions of its emergency vehicle statute which imply liability on the part of an emergency vehicle driver for the consequences of his reckless or grossly negligent conduct,[7] it had failed to apply those provisions in the *Thornton* case. 233 Kan. at 757–58, 666 P.2d at 670 (Holmes, J., dissenting).

The approach used in *Thornton* and followed by several other courts bypasses the statutory language suggesting a "reckless disregard" standard of care and focuses on the police officer's right to pursue and on a proximate cause analysis. In *Thornton*, the following language was quoted from *Roll v. Timberman*, 94 N.J.Super. 530, 536, 229 A.2d 281, 284, *certif. denied*, 50 N.J. 84, 232 A.2d 147 (1967):

> " 'The reasoning which underlies the rejection of liability in these cases is twofold: (1) it is the duty of a police officer to apprehend those whose reckless driving makes use of the highway dangerous to others; (2) the proximate cause of the accident is the reckless driving of the pursued, notwithstanding recognition of the fact that the police pursuit contributed to the pursued's reckless driving.' " 233 Kan. at 748, 666 P.2d at 664.

*See also Chambers v. Ideal Pure Milk Co.*, 245 S.W.2d 589 (Ky.1952); *Jackson v. Olson*, 77 Or.App. 41, 712 P.2d 128 (1985), *review denied*, 300 Or. 605, 717 P.2d 1182

---

**4.** The phrase "reckless disregard for the safety of others" used in W.Va.Code, 17C-5-2(d), is synonymous with gross negligence. *See State v. Vollmer*, 163 W.Va. 711, 259 S.E.2d 837 (1979).

**5.** Syllabus Point 8 of *Thornton* reads: "The duties placed upon the driver of an emergency vehicle by K.S.A. 8-1506(*d*) relative to driving with due regard for the safety of others applies exclusively to the operation of the emergency vehicle itself."

**6.** Syllabus Point 10 of *Thornton* states:

"A police officer operating his emergency vehicle in compliance with K.S.A. 8-1506(*d*) while pursuing a law violator is granted privileges and immunities by the statute and is not liable, as a matter of law, for reckless and negligent acts committed by the fleeing law violator. The police officer is not the insurer of the law violator he is pursuing."

**7.** The Kansas emergency vehicle statute provided, in pertinent part:

"The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of reckless disregard for the safety of others." Kan.Stat.Ann. 8-1506(d) (1974).

Syllabus Point 6 of *Thornton* states:

"The privileges granted by K.S.A. 8-1506 do not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons and does not protect the driver from the consequences of reckless disregard for the safety of others (K.S.A. 8-1506[*d*])."

(1986); *Nevill v. City of Tullahoma,* 756 S.W.2d 226 (Tenn.1988).

Other jurisdictions have recognized that the duty of the police to pursue law violators must be balanced with a duty of care to the public. Typical of the reasoning of these courts is this language from *Tetro v. Town of Stratford,* 189 Conn. 601, 609, 458 A.2d 5, 9–10 (1983):

> "Other courts, construing similar statutory language, have explained that emergency vehicle legislation provides only limited shelter from liability for negligence. The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve operators of emergency vehicles from their general duty to exercise due care for the safety of others. *Brummett v. County of Sacramento,* 21 Cal.3d 880, 886–87, [148 Cal.Rptr. 361,] 582 P.2d 952 (1978); *City of Sacramento v. Superior Court of the State of California,* [131 Cal.App.3d 395, 182 Cal. Rptr. 443 (1982)]; *Mason v. Bitton,* [85 Wash.2d 321, 534 P.2d 1360 (1975)]." (Footnote omitted).

*See also Fiser v. City of Ann Arbor,* 417 Mich. 461, 339 N.W.2d 413 (1983); *Lee v. City of Omaha,* 209 Neb. 345, 307 N.W.2d 800 (1981); *Stanton v. State,* 29 A.D.2d 612, 285 N.Y.S.2d 964 (1967), *aff'd* 26 N.Y.2d 990, 311 N.Y.S.2d 28, 259 N.E.2d 494 (1970). However, these courts appear to focus exclusively on the "due care" language of their emergency motor vehicle statute and make no reference to the "reckless disregard" provisions of their statutes.

Our most factually analogous case is *McClanahan v. Putnam County Commission,* 174 W.Va. 478, 327 S.E.2d 458 (1985). In *McClanahan,* an ambulance driver responding to an emergency traveled left of center and collided with another vehicle, injuring the driver. We recognized that while the emergency vehicle driver may be exempt from complying with certain traffic regulations pursuant to W.Va.Code, 17C–2–5(b), the driver can still be liable for failure to exercise due regard within the meaning of W.Va.Code, 17C–2–5(d). As we stated in Syllabus Point 4 of *McClanahan:*

> "By virtue of W.Va.Code, 17C–2–5(d), the driver of an authorized emergency vehicle is not relieved of the duty to drive with due regard for the safety of all persons."

We emphasize that in *McClanahan* the collision involved the emergency vehicle itself. In *McClanahan,* we did not attempt an overall analysis of our emergency statute, nor did we attempt to interpret the applicability of the reckless disregard language in subsection (d).

■ Historically, in any statutory analysis, we have endeavored to interpret a statute so as to give meaning to each part, as we stated in Syllabus Point 3 of *State ex rel. Fetters v. Hott,* 173 W.Va. 501, 318 S.E.2d 446 (1984):

> " 'In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975)."

As we have earlier indicated, there is an apparent disparity between the "due regard" and "reckless disregard" standards contained in subsection (d) of our emergency vehicle statute. This disparity is more apparent than real if we consider the various provisions that exist with regard to emergency vehicles.

It may be assumed that an emergency vehicle driver will have had some specialized training in the operations of his vehicle. Under W.Va.Code, 17C–2–5, the emergency vehicle operator is shielded against liability arising from violations of the ordinary motor vehicle statutes.[8] Since

---

**8.** We use the term "shielded" in a limited sense because while W.Va.Code, 17C–2–5(b), identifies the rules of the road which the emergency vehicle driver may disregard, it still requires some cautionary conduct on his part. For instance,

W.Va.Code, 17C–2–5(b)(2), allows an emergency vehicle to proceed past stop signs or red lights, "but only after slowing down as may be necessary for safe operation." W.Va.Code, 17C–2–5(b)(3), allows the driver to exceed the speed

the operator is in control of the vehicle, it is reasonable to impose a "due care" standard on him and to hold him liable for violating that standard where the emergency vehicle is involved in the collision. *McClanahan, supra.*

This conclusion is reinforced by the provisions of W.Va.Code, 17C–9–5 (1971), which require the drivers of other vehicles to yield the right-of-way when an emergency vehicle approaches with its lights and sirens or other audible signal in operation.[9] W.Va.Code, 17C–9–5(b), specifies that these provisions do not relieve the operator of the emergency vehicle "from the duty to drive with due regard for the safety of all persons using the highway." *See Davis v. Cross,* 152 W.Va. 540, 164 S.E.2d 899 (1968). This section does not contain the "reckless disregard" provisions which appear in W.Va.Code, 17C–2–5(d). It is reasonable to conclude that this omission in the more specific right-of-way statute indicates that the legislature was concerned solely with the operation of the emergency vehicle vis-a-vis other vehicles and elected to impose a general due care standard.

This conclusion becomes more apparent when we turn to the general emergency vehicle statute. W.Va.Code, 17C–2–5(a), specifically identifies an emergency situation as including "the pursuit of an actual or suspected violator of the law." The appearance of the reckless disregard standard in the more general emergency vehicle statute, W.Va.Code, 17C–2–5(d), suggests that this higher measure of liability was reserved by the legislature for colli-

sions other than those involving the emergency vehicle itself.

Common sense dictates that a different standard ought to apply when officers are in pursuit of a lawbreaker who, in the ensuing chase, collides with and injures a third party. The duty to pursue and apprehend law violators should not be fettered by the specter of secondary liability based on a due care standard. It is the law violator who, in his efforts to escape justice, collides with the third party and directly causes the injuries. Only when the officer is guilty of gross negligence or reckless conduct in the pursuit that causes or contributes to the collision by the lawbreaker should liability attach. For this reason, we decline to follow those courts that impose the "due care" standard illustrated by the Connecticut case of *Tetro.* They have apparently ignored the "reckless disregard" language that plainly appears in their emergency vehicle statutes.

However, we also reject the standard set out by the Kansas Supreme Court in *Thornton,* which gives total immunity to the pursuing officer. We concede that the police have an obligation to apprehend law violators, but we do not accept the thesis that in so doing police officers are completely immune from liability for their actions in conducting vehicular pursuits of such violators.

Moreover, we do not agree with the Kansas Supreme Court's conclusion that the lawbreaker, in attempting to avoid arrest, is the only party responsible for the injuries arising from a collision between the pursued vehicle and that of a third

limit "so long as he does not endanger life or property." W.Va.Code, 17C–2–5(a), defines the type of emergency in which the statute applies. Finally, W.Va.Code, 17C–2–5(c), requires that flashing lights and/or sirens or other audible devices be sounded while the emergency vehicle is operating. For the full text of W.Va.Code, 17C–2–5, see note 3, *supra.*

9. W.Va.Code, 17C–9–5(a) provides, in part:
 "Upon the immediate approach of an authorized emergency vehicle equipped with at least one flashing lighted lamp of a color authorized by section twenty six [§ 17C–15–26], article fifteen ·of this chapter, which is visible under normal atmospheric conditions

from a distance of five hundred feet to the front of such vehicle other than a police vehicle when operated as an authorized emergency vehicle, and when the driver is giving audible signal by siren, exhaust whistle, or bell:
 (1) The driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer."

party. We have recognized that it is possible for more than one party to contribute to an accident, as we explained in Syllabus Point 6 of *Burdette v. Maust Coal & Coke Corp.*, 159 W.Va. 335, 222 S.E.2d 293 (1976):

" 'In a concurrent negligence case, the negligence of the defendant need not be the sole cause of the injury, it being sufficient that it was one of the efficient causes thereof, without which the injury would not have resulted; but it must appear that the negligence of the person sought to be charged was responsible for at least one of the causes resulting in the injury.' *Syllabus* point 5, *Long v. City of Weirton*, [158 W.Va. 741], 214 S.E.2d 832 (1975)."

▮ Nor does the fact that a law violator's actions were the immediate cause of the third party's injuries necessarily absolve the pursuing officer of liability if the officer's reckless conduct was a substantial factor in bringing about the ultimate collision. We spoke to this general concept in Syllabus Point 13 of *Anderson v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61 (1990):

"A tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct."

The fact that the applicable standard of care is "reckless disregard" rather than "due care" does not affect these principles.

Our position is not unlike that of the Supreme Court of North Carolina in *Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601 (1988). The North Carolina statute applicable in *Bullins* dealt specifically with pursuit of law violators and contained both "due regard" and "reckless disregard" provisions.[10] The court held that the due regard provision was applicable where the

officer's car collided with another person or property, but that the reckless disregard provision came into play when the violator being chased collided with a third party:

"This Court has established the standard of care where the conduct of an officer in the chase or apprehension of a law violator results in the *officer's* vehicle colliding with another person, vehicle, or object. The officer is held to the standard of care that a reasonably prudent person would exercise in the discharge of official duties of a like nature under like circumstances....

"... The last sentence of [N.C.Gen. Stat. § 20-145 (Supp.1987)] establishes as the public policy of North Carolina that if an officer's conduct under the facts of this case is determined to be grossly negligent, then the statute does not protect him and he may be liable for damages proximately resulting from such gross negligence.

"... Where the officer's vehicle does not collide with another person, vehicle, or object under these conditions, the policy of the state is that liability cannot attach unless the officer's conduct constitutes gross or wanton negligence." 322 N.C. at 582-83, 369 S.E.2d at 603. (Emphasis in original; citations omitted).

We are in agreement with these principles. They parallel our holding in *McClanahan*, where we concluded that W.Va. Code, 17C-2-5(d), requires the driver of an emergency vehicle to exercise due care under the circumstances to avoid collisions between the emergency vehicle and persons or property. As our statutory analysis reveals, where the police are engaged in a vehicular pursuit of a known or suspected law violator, and the pursued vehicle collides with the vehicle of a third party, under W.Va.Code, 17C-2-5, the pursuing officer is not liable for injuries to the third party arising out of the collision unless the

---

10. In *Bullins,* 322 N.C. at 582, 369 S.E.2d at 603, the court quoted the following language from N.C.Gen.Stat. § 20-145 (Supp.1987):
"The speed limitations set forth in this Article shall not apply to vehicles when operated with due regard for safety under the direction of the police in the chase or apprehension of

violators of the law or of persons charged with or suspected of any such violation.... *This exemption shall not, however, protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others."* (Emphasis in original).

officer's conduct in the pursuit amounted to reckless conduct or gross negligence and was a substantial factor in bringing about the collision.[11]

What type of conduct is reckless or amounts to gross negligence in a pursuit context cannot be determined by a simple formula. Courts have indicated a number of factors that can be considered, such as the length, characteristics, and speed of the pursuit; the area of the pursuit, whether rural or urban; the highway characteristics such as curves or no passing zones; the presence of pedestrians and traffic; weather and visibility; and the seriousness of the law violation.[12] *E.g., Myers v. Town of Harrison*, 438 F.2d 293 (2d Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 64, 30 L.Ed.2d 57 (1971); *Fiser v. City of Ann Arbor, supra; Kuzmics v. Santiago*, 256 Pa.Super. 35, 389 A.2d 587 (1978). *Cf. DeWald v. State*, 719 P.2d 643 (Wyo.1986).

## II.

In this case, the trial court did, through its instructions, properly set the standard as one of reckless disregard or gross negligence. The jury found liability, but the trial court determined that there was insufficient evidence to demonstrate that the conduct of the pursuing officers was in reckless disregard of the safety of others and granted the defendants' motion for judgment notwithstanding the verdict.

■ The sufficiency of the evidence in a civil case is tested by the standard set out in Syllabus Point 6 of *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987):

" 'In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.' Syl. pt. 5, *Orr v. Crowder*, [173] W.Va. [335], 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984)."

In *McClung*, we also made the following statements with regard to motions for judgment notwithstanding the verdict:

"A motion for judgment notwithstanding the verdict pursuant to *W.Va. R.Civ.P.* 50(b) provides the trial court with an opportunity, after the jury has been discharged, to reconsider its previous refusal to grant a motion for a directed verdict made at the close of all of the evidence. The same factors as to the sufficiency of the evidence which are examined in deciding a motion for a directed verdict apply also when ruling upon a motion for a judgment notwithstanding the verdict. Accordingly, in a case where the evidence is such that the jury could have properly found for either party upon the factual issues, a motion for judgment notwithstanding the verdict should not be granted. *Morgan v. Bottome*, 170 W.Va. 23, 24, 289 S.E.2d 469, 470 (1982). *Accord* M. Lugar and L. Silverstein, *West Virginia Rules of Civil Procedure* 379–80, 375 (1960).

"Finally, the action of the trial court in setting aside a jury verdict, while entitled to peculiar weight on appeal, will, nevertheless, be reversed where a consideration of all of the evidence clearly shows a proper case for jury determination. *See* syl. pt. 2, *Utter v. United Hospital Center, Inc.*, 160 W.Va. 703, 236 S.E.2d 213 (1977)." 178 W.Va. at 454, 360 S.E.2d at 231. (Footnote omitted).

---

**11.** As we have earlier noted, W.Va.Code, 17C–2–5, defines emergency situations and requires a responding emergency vehicle to activate its lights and/or sirens. *See* note 8, *supra*.

**12.** Although the appellants rely, in part, on the Department's vehicular pursuit policy issued August 1, 1986, we find that the policy does not set a standard of care and is, therefore, not helpful in the resolution of that issue. The policy does place restrictions on when and in what circumstances an officer may initiate or continue a pursuit, but none of these restrictions were at issue in this case.

■ Viewed in this light, the evidence presented below showed that at about 5:30 p.m. on September 15, 1987, an anonymous caller advised the Princeton Detachment of the State Police that Mr. Akers was driving towards Princeton on Route 20 in a pickup truck that had been reported stolen in Virginia earlier that day. Mr. Akers was a suspect in a series of burglaries in Mercer, Monroe, and Summers Counties, and warrants had been issued for his arrest on charges of burglary and grand larceny in Virginia and Tennessee.

In addition, Mr. Akers had been the subject of a high-speed pursuit by the Princeton city police the previous evening on Route 460, a four-lane highway. Trooper Ratliff and Corporal Fulknier had joined in the pursuit at the request of the Princeton police. The chase ended when the vehicle Mr. Akers was driving crossed the median and two lanes of opposing traffic and ran off the road. Several passengers in the vehicle were apprehended, but Mr. Akers escaped on foot. The vehicle was discovered to have been stolen and was found to contain various items of stolen property, illicit drugs, and a firearm. Trooper Ratliff and Corporal Fulknier spent the better part of the night interviewing witnesses and attempting to locate Mr. Akers. They also knew that Mr. Akers had previously been convicted of armed robbery.

Trooper Ratliff and Corporal Fulknier were dispatched to investigate the anonymous tip. With Trooper Ratliff driving, the two officers proceeded in an unmarked police car towards Glenwood Road. Both officers were familiar with this road, a two-lane secondary road running past residential areas, side streets, some businesses, a golf course, and a school. The area is characterized by the appellants as residential. In places where the road is hilly and twisting, there is no passing, and the maximum speed limit is 35 miles per hour. In addition, there are several straight stretches where the speed limit is 45 miles per hour. Although traffic on the day in question was not characterized as heavy, it appears that many people use Glenwood Road at that time of day on their way home from work. Mrs. Peak testified that on previous occasions she had seen children playing alongside the road at that time of day, although there was no evidence that any children were present on September 15, 1987.

As they approached the intersection of Route 20 on Glenwood Road, the officers observed a truck matching the description of the stolen vehicle turn onto Glenwood Road and drive towards them. As the truck passed them, the officers recognized the driver as Mr. Akers. When Trooper Ratliff started to turn the police car around, Mr. Akers accelerated. The officers turned on their lights and siren,[13] radioed to the detachment that they were pursuing Mr. Akers, and requested that a roadblock be established at the intersection of Glenwood Road and Route 460, approximately 2.5 miles away.

Mr. Akers' speed in the course of the chase was estimated at between 60 and 100 miles per hour. On several occasions, Trooper Ratliff and Corporal Fulknier saw Mr. Akers pass slower moving vehicles in blind curves and force oncoming traffic off the road. On such occasions the officers slowed down and waited for preceding traffic to move to the side of the road before continuing the chase. Mr. Akers stated that the police vehicle was never more than 100 yards behind him, although from time to time, the officers lost sight of the Akers vehicle.

As he rounded the final curve before the intersection of Glenwood Road and Route 460, Mr. Akers saw a line of cars waiting to enter the four-lane highway. Out of the sight of Trooper Ratliff and Corporal Fulknier, Mr. Akers crossed into the oncoming lane of traffic with the intention of passing through a corner gas station and entering Route 460 from the other side. The vehicle driven by Mr. Akers collided head-on with the car driven by Mrs. Peak. Trooper Ratliff and Corporal Fulknier arrived on the

---

**13.** No evidence contradicted the police officers' statements with regard to the operation of the emergency lights and siren. Mr. Akers stated that he did not remember seeing such lights or hearing such siren. This evidence is purely negative in character and is not entitled to great weight. *Davis v. Cross, supra.*

scene seconds later. Mr. Akers and an independent witness testified that both officers concerned themselves with Mr. Akers and that neither attempted to assist Mrs. Peak for several minutes. The entire pursuit lasted less than five minutes. Sergeant Roger Bright, who was en route to set up the road block at the intersection, arrived shortly thereafter.

Analyzing the foregoing facts, we find no justification for disturbing the trial court's final ruling. Trooper Ratliff and Corporal Fulknier were confronted with a serious law violator who had escaped capture in a vehicular pursuit the previous evening. The officers knew of Mr. Akers' past record and the fact that the vehicle he abandoned on September 14, 1987, contained a weapon and drugs. Both vehicles driven by Mr. Akers on these two days were stolen. The officers were familiar with the road on which the pursuit was conducted. There was good visibility during the chase and no inclement weather which would make the road hazardous. Even though the speed was estimated at between 60 and 100 miles per hour, the officers were careful to slow down when passing cars. There were no pedestrians, and the traffic was moderate. The pursuit lasted only a brief period of time. It does not appear that the officers forced the pursuit by attempting to overtake Mr. Akers or by forcing him off the roadway. Neither officer attempted to fire his weapon, an act which might cause a fleeing suspect to panic. When Mr. Akers crossed the center line and drove into the filling station where the collision occurred, the officers were not in sight.

In these circumstances, we believe the trial court was correct in holding that the officers' conduct did not constitute gross negligence. Consequently, we affirm the judgment of the circuit court.

For the foregoing reasons, the final order of the Circuit Court of Mercer County is affirmed.

Affirmed.