HENRY PARISH, JR., as ADMINISTRATOR of the ESTATE OF LOUIS LYLE PARISH v. CLARENCE LOUIS HILL, III, NATHANIEL EUBANKS, in his INDIVIDUAL CAPACITY AND AS AN OFFICER of the CITY of HILLSBOROUGH POLICE DEPARTMENT, KEVIN DEAN, IN HIS INDIVIDUAL CAPACITY AND AS AN OFFICER OF THE CITY OF HILLSBOROUGH POLICE DEPARTMENT, LARRY BIGGS, IN HIS INDIVIDUAL CAPACITY AND AS CHIEF OF THE CITY OF HILLSBOROUGH POLICE DEPARTMENT, AND THE CITY OF HILLSBOROUGH

No. 368PA98

(Filed 9 April 1999)

**Police Officers— high speed chase—gross negligence—summary judgment**

The trial court properly granted summary judgment for two officers in their official capacities on gross negligence claims in a wrongful death action where the officers were involved in a high speed chase which ended with a one car accident in which the passenger in the fleeing car was killed. The officers pursued

PARISH v. HILL

[350 N.C. 231 (1999)]

defendant Hill, the driver, over a stretch of approximately ten miles of roadway during a time of day when traffic was very light, they did not attempt to overtake defendant's vehicle or to force defendant's vehicle from the roadway, and they were well behind defendant's vehicle and traveling at a reduced speed when it crashed. Plaintiff failed to demonstrate any negligence by the officers, and certainly not the degree of gross negligence required to hold the officers liable for decedent's death.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 130 N.C. App. 195, 502 S.E.2d 637 (1998), affirming in part and reversing in part an order entered by Hudson, J., on 21 October 1996 in Superior Court, Durham County. Heard in the Supreme Court 11 February 1999.

*Morgan, Reeves & Gilchrist, by Robert B. Morgan, and C. Winston Gilchrist, for plaintiff-appellees.*

*The Brough Law Firm, by William C. Morgan, Jr., for defendant-appellants Eubanks and Dean.*

WAINWRIGHT, Justice.

Plaintiff, Henry Parish, Jr., as administrator of the estate of decedent Louis Lyle Parish, commenced this wrongful death action on 30 November 1994. Plaintiff, in his complaint, alleged claims against Clarence Louis Hill, III (Hill), Lieutenant (now Chief) Nathaniel Eubanks (Lieutenant Eubanks) and Officer Kevin Dean (Officer Dean) of the Hillsborough Police Department in their individual and official capacities for alleged gross negligence stemming from their roles in a pursuit-related vehicular accident. Plaintiff further alleges claims against former Police Chief Larry Biggs (Chief Biggs) and the City of Hillsborough (the City) for alleged failures in training, policy, and supervision, under both common law and federal law theories, including 42 U.S.C. § 1983. After extensive discovery, defendants Lieutenant Eubanks, Officer Dean, Chief Biggs, and the City filed a motion for summary judgment on 3 September 1996. Following a hearing, the trial court entered an order on 21 October 1996 granting defendants' motion for summary judgment as to all claims. On appeal, a unanimous panel of the Court of Appeals affirmed the trial court's summary judgment as to the claims against Chief Biggs and the City, including the section 1983 claims, and the claims against Lieutenant Eubanks and Officer Dean in their individual capacities;

however, the Court of Appeals reversed the trial court as to plaintiff's gross negligence claims against Lieutenant Eubanks and Officer Dean in their official capacities. This Court granted defendants' petition for discretionary review pursuant to N.C.G.S. § 7A-31. Defendant Hill is not a party to this appeal.

The materials filed in support of and in opposition to the summary judgment motion, including depositions of, *inter alia,* defendants Hill, Lieutenant Eubanks, and Officer Dean, show that at approximately 10:00 p.m. on the evening of 19 February 1993, decedent Louis Lyle Parish drove to the Durham apartment of his close friend, defendant Hill. Hill had borrowed his sister's BMW automobile for the evening, and the two decided to go to the "Ship Ahoy" club in Hillsborough. As they traveled to Chapel Hill, they purchased a six-pack of beer at a convenience store and began "cruising in the BMW down Franklin Street," drinking the beer. With Hill driving, they headed north to Hillsborough on NC 86.

Early the next morning, at approximately 2:00 a.m. on 20 February 1993, Lieutenant Eubanks, a sixteen-year veteran of the Hillsborough Police Department, traveled to the Orange County Communications Center to pick up the daily activity reports. He was driving his 1993 Ford Crown Victoria, marked with police emblems and blue lights. After picking up the reports, Lieutenant Eubanks drove to the intersection of New Hope Church Road and NC 86, just south of Hillsborough. Upon stopping and looking to his left, he noticed a vehicle traveling north on NC 86 in his direction. Lieutenant Eubanks entered the highway and traveled only a short distance when he realized the vehicle he had noticed earlier was approaching him at a high rate of speed. The vehicle, the BMW driven by Hill, passed Lieutenant Eubanks approximately ten seconds after Lieutenant Eubanks had turned onto NC 86. Lieutenant Eubanks estimated the speed of the BMW at approximately eighty miles per hour in a fifty-five-mile-per-hour zone. The vehicle passed Lieutenant Eubanks at a point where NC 86 curved slightly to the right and was marked with a "double yellow" line indicating a no-passing zone.

Immediately after passing Lieutenant Eubanks, Hill realized he had passed a law enforcement officer, assumed a stop would be attempted, and increased his speed to approximately ninety miles per hour. At this point, Lieutenant Eubanks decided to stop the BMW and notified dispatch of his location and intention. Lieutenant Eubanks followed Hill for approximately one-half a mile and then activated his

blue lights and siren. Because of his speed, Hill did not realize he was being ordered to stop until he turned onto I-85 northbound. In Lieutenant Eubanks' opinion, the driver of the BMW had committed the offenses of passing in a no-passing zone, speeding, and careless and reckless driving. In his deposition, Hill stated when he realized he was being directed to stop, he was confident he could lose Lieutenant Eubanks simply because Lieutenant Eubanks was still so far back. Hill maintained that belief throughout the ensuing pursuit, stating that the only reason he attempted to elude Lieutenant Eubanks was that he felt he could get away with it.

Lieutenant Eubanks followed Hill onto I-85, alerting the dispatcher that he was pursuing a vehicle that was refusing to stop. Lieutenant Eubanks requested the dispatcher to alert the Durham Police Department because the pursuit was moving towards Durham. The pursuit continued on I-85 for a distance of five miles. While Lieutenant Eubanks estimated that he and Hill passed approximately ten to twelve vehicles, Hill recollected four to five vehicles. Both agree they encountered no vehicles on NC 86 prior to entering I-85. Lieutenant Eubanks stated that Hill switched lanes several times as he encountered other vehicles in his path and that Hill turned off the BMW's headlights on several occasions in an attempt to elude Lieutenant Eubanks. Lieutenant Eubanks stated that several drivers, apparently comprehending what was taking place, pulled to the shoulder of the road to avoid danger.

During this five-mile stretch on I-85, Lieutenant Eubanks stayed primarily in the left lane, attempting to minimize the danger to other motorists, most of whom were in the right lane. On this five-mile stretch, Lieutenant Eubanks estimated Hill's top speed at 120 miles per hour and his own top speed at 130 miles per hour. The vehicles did not maintain their top speeds for the entire five miles.

At this point, Hill turned off I-85 at exit 170 and headed south on I-85. He subsequently crossed the median, and once again headed north on I-85. Lieutenant Eubanks stopped, waited for traffic to clear, and proceeded north again, thereby allowing Hill to put even more distance between himself and Lieutenant Eubanks. At the interchange of I-85 and US 70 there is a truck stop and an exit ramp. Hill exited I-85 down this exit ramp and proceeded east on US 70 toward Durham.

Officer Dean had been monitoring the pursuit by radio and had positioned himself near the truck stop. As he saw the BMW pass him

at an estimated speed of ninety to one hundred miles per hour, Officer Dean pulled out to pursue Hill but was impeded by a tractor-trailer entering the roadway. At that time, Lieutenant Eubanks was fast approaching Officer Dean and the tractor-trailer. In order to avoid a collision with Officer Dean's vehicle, Lieutenant Eubanks had to brake and pull onto the median. As a result of this incident, Lieutenant Eubanks and Officer Dean lost sight of the BMW and did not see it again until they arrived at the accident scene.

As Hill sped away from Lieutenant Eubanks and Officer Dean, he was unaware that the truck had cut off the pursuit; however, he was aware that he was no longer being closely pursued. Lieutenant Eubanks and Officer Dean resumed traveling at a normal rate of speed on US 70 in the direction the BMW was last seen. Meanwhile, Hill continued to travel at a high rate of speed along a straightaway of US 70, nearing its intersection with NC 751. Hill admitted he never saw a second officer (Officer Dean) or any other officers on US 70, encountered no additional vehicles on US 70, and never saw a blue light in his rearview mirror while on US 70. Furthermore, Hill stated he felt he had lost the officers, and the only reason he continued to drive at a high rate of speed was to simply make sure he had lost Lieutenant Eubanks.

As he approached the intersection of US 70 and NC 751, Hill was spotted by Officer Bennie E. Bradley of the Durham Police Department (Officer Bradley). Officer Bradley had been monitoring radio traffic concerning the chase and was aware the BMW might be entering Durham. Therefore, Officer Bradley had positioned his vehicle at the intersection so that he could assist if the pursuit entered Durham. As Hill approached, Officer Bradley looked back on US 70 and saw no approaching vehicles. Moments later, he observed the BMW's headlights were off and it was traveling in excess of ninety miles per hour. When Hill passed Officer Bradley's location, Officer Bradley pulled into the road and traveled only 375 feet when the BMW suddenly veered left, crossed the westbound lane of travel, and disappeared into the darkness west of Orangewood Road, ultimately crashing into a residence. Officer Bradley called for rescue and drove to the accident scene. When he exited his vehicle, Officer Bradley located the driver and then saw Lieutenant Eubanks and Officer Dean approaching the scene at normal speeds. The body of the deceased, Louis Lyle Parish, was discovered later.

In general, the weather on 19-20 February 1993 was clear and the roadways were dry. Because it was 2:00 a.m. or later, there was light

vehicular traffic. Lieutenant Eubanks had his blue lights and siren activated during the entire pursuit except for a couple of brief moments during the early part of the pursuit when he turned off the siren to communicate with Orange Central. Further, Lieutenant Eubanks never attempted to pass or ram the Hill vehicle.

At the outset, we note that it is proper for a trial court to grant summary judgment for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (1990). The moving party has the burden of establishing the absence of any genuine issue of material fact, and the evidence presented should be viewed in the light most favorable to the nonmoving party. *Holley v. Burroughs Wellcome Co.*, 318 N.C. 352, 355-56, 348 S.E.2d 772, 774 (1986); *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Furthermore, although it is seldom appropriate to grant summary judgment in a negligence action, it is proper if there are no genuine issues of material fact, and the plaintiff fails to demonstrate one of the essential elements of the claim. *Lavelle v. Schultz*, 120 N.C. App. 857, 859, 463 S.E.2d 567, 569 (1995), *disc. rev. denied*, 342 N.C. 656, 467 S.E.2d 715 (1996); *see also Rorrer v. Cooke*, 313 N.C. 338, 355, 329 S.E.2d 355, 366 (1985).

## I. STANDARD OF CARE FOR LAW ENFORCEMENT OFFICERS IN PURSUIT-RELATED VEHICULAR ACCIDENTS

It is well settled that "[p]olice officers have a duty to apprehend lawbreakers and society has a strong interest in allowing the police to carry out that duty without fear of becoming insurers for the misdeeds of the lawbreakers they pursue." *Mixon v. City of Warner Robins*, 209 Ga. App. 414, 416, 434 S.E.2d 71, 73 (1993), *rev'd on other grounds*, 264 Ga. 385, 444 S.E.2d 761 (1994). In such a situation, the law enforcement officer must conduct a balancing test, weighing the interests of justice in apprehending the fleeing suspect with the interests of the public in not being subjected to unreasonable risks of injury.

The first case to address this issue in North Carolina was the case of *Goddard v. Williams*, 251 N.C. 128, 110 S.E.2d 820 (1959), *overruled by Young v. Woodall*, 343 N.C. 459, 471 S.E.2d 357 (1996). In that case, the plaintiff instituted an action for negligence against a deputy sheriff for injuries allegedly suffered as the result of a

collision between his vehicle and the deputy's vehicle. The plaintiff alleged the deputy was negligent in driving at an unsafe speed. The deputy answered by denying his negligence, claiming that he was pursuing the plaintiff at the time of the accident because the plaintiff had failed to stop at a stop sign. *Id.* at 129, 110 S.E.2d at 821-22. Following the presentation of evidence, the trial court instructed the jury that it could not find the officer liable unless he was grossly negligent. *Id.* at 132, 110 S.E.2d at 823. The jury returned a verdict in favor of the deputy, and the plaintiff appealed. Upon review, this Court reversed and ordered a new trial, holding that the standard of care in such situations was not gross negligence, but ordinary negligence. In so doing, this Court relied upon both statutory and case law. In *Goddard*, this Court focused on N.C.G.S. § 20-145, which provides:

### § 20-145. When speed limit not applicable.

The speed limitations set forth in this Article shall not apply to vehicles when operated with due regard for safety under the direction of the police in the chase or apprehension of violators of the law or of persons charged with or suspected of any such violation . . . . *This exemption shall not, however, protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others.*

N.C.G.S. § 20-145 (1993) (emphasis added). This Court then quoted with approval a Michigan case in which the Michigan Supreme Court concluded:

"We know of no better standard by which to determine a claim of negligence on the part of a police officer than by comparing his conduct . . . to the care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances."

*Goddard*, 251 N.C. at 134, 110 S.E.2d at 824-25 (quoting *McKay v. Hargis*, 351 Mich. 409, 418, 88 N.W.2d 456, 460 (1958)); *cf. Peak v. Ratliff*, 185 W. Va. 548, 552, 408 S.E.2d 300, 304 (1991) (where the West Virginia Supreme Court held that the statutory language "clearly suggests that the emergency driver is accountable only for reckless acts or gross negligence").

This Court's ruling in *Goddard* had considerable impact on the manner in which North Carolina courts handled police-chase cases. Jeremy D. Arkin, Note, *Police Chase the Bad Guys, and Plaintiffs*

*Chase the Police:* Young v. Woodall *and the Standard of Care for Officers in Pursuit,* 75 N.C. L. Rev. 2468, 2481 (1997) [hereinafter Arkin, Police Chase]. "In the years following *Goddard,* North Carolina courts applied the ordinary negligence standard to an officer's general driving conduct while in pursuit of violators of the law." *Id.*

This Court departed slightly from the *Goddard* approach in the case of *Bullins v. Schmidt,* 322 N.C. 580, 369 S.E.2d 601 (1988). In reversing the trial court, this Court departed from prior precedent in two distinct ways. First, this Court bifurcated the standard of care to which an officer would be held in a pursuit-related vehicular accident. *See* Arkin, *Police Chase* at 2484. If the officer's vehicle was involved in the collision, the *Goddard* standard of ordinary negligence would apply. *Bullins,* 322 N.C. at 582, 369 S.E.2d at 603. However, in cases in which "the injuries complained of do *not* result from the officer's vehicle colliding with another person, vehicle, or object in the chase or apprehension of a law violator," a gross negligence standard applies. *Id.* at 583, 369 S.E.2d at 603.

Second, this Court construed N.C.G.S. § 20-145 as establishing a general standard of care rather than an exemption from speed laws. Arkin, *Police Chase* at 2485. This Court interpreted the last sentence of the statute to establish a general standard of care of gross negligence, contrary to this Court's holding in *Goddard.*

Thereafter, in *Young v. Woodall,* 343 N.C. 459, 471 S.E.2d 357, this Court abolished the distinction established in *Bullins,* concluding that it "[saw] no good reason why there should be a distinction between the standards of care based on whether the officer's vehicle was [involved] in the collision." *Id.* at 462, 471 S.E.2d at 359. Therefore, as the law stands currently, in *any* civil action resulting from the vehicular pursuit of a law violator, the gross negligence standard applies in determining the officer's liability.

In the time frame between *Bullins* and *Young,* the North Carolina Court of Appeals applied the *Bullins* standard in two decisions: *Fowler v. N.C. Dep't of Crime Control & Public Safety,* 92 N.C. App. 733, 376 S.E.2d 11 (upholding Industrial Commission's denial of claims), *disc. rev. denied,* 324 N.C. 577, 381 S.E.2d 773 (1989), and *Clark v. Burke County,* 117 N.C. App. 85, 450 S.E.2d 747 (1994) (upholding trial court's grant of summary judgment).

PARISH v. HILL

[350 N.C. 231 (1999)]

## II. DISCUSSION

At the outset, we note that gross negligence has been defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins*, 322 N.C. at 583, 369 S.E.2d at 603. Further, " '[a]n act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.' " *Wagoner v. N.C. R.R. Co.*, 238 N.C. 162, 167, 77 S.E.2d 701, 705 (1953) (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 378 (1929)).

In the instant case, the Court of Appeals attempted to distinguish the facts of this case from those of *Bullins*, *Fowler*, *Clark*, and *Young*. To begin our discussion, a similar comparison of the facts and holdings in those four cases with the facts of the instant case, as well as the reasoning of the Court of Appeals, is instructive.

### A. *Bullins*, *Fowler*, *Clark* and *Young*:

#### 1. *Bullins v. Schmidt*:

At approximately 1:03 a.m. on 20 January 1985, Officer R.J. Blakely, Jr. (Officer Blakely), of the Greensboro Police Department observed an automobile with a Florida license plate occupying two lanes of traffic on US 220. The vehicle, operated by Luther McMillan, was weaving left to right between two lanes. Officer Blakely attempted to stop the vehicle by turning on his blue lights and siren, but McMillan refused to stop and continued at a low rate of speed. Officer Blakely radioed his observations to the department and was soon assisted by Sergeant C.R. Schmidt, who unsuccessfully attempted to stop the vehicle by utilizing a moving roadblock. McMillan evaded Sergeant Schmidt and continued north on US 220 at an increasingly higher rate of speed. *Bullins*, 322 N.C. at 581, 369 S.E.2d at 602.

The pursuit lasted approximately fourteen minutes and covered a distance of eighteen miles extending into Rockingham County. Officer Blakely and Sergeant Schmidt remained in contact with Lieutenant Stewart, their supervisor, who authorized them to continue the pursuit. The pursuit reached speeds of one hundred miles per hour, and several vehicles had to pull off to the side of US 220 in order to avoid a collision. Thereafter, McMillan attempted to pass a northbound vehicle while in a no-passing zone and struck the decedent's vehicle head on, killing both drivers. *Id.* at 581-82, 369 S.E.2d at 602.

At the location of the accident, US 220 was a two-lane road. At the time of the accident, McMillan's headlights were off. The police vehicles were not involved in the actual collision. Sergeant Schmidt was 100 to 125 yards behind McMillan, with Officer Blakely following Sergeant Schmidt. The officers had in fact reduced their speed and increased the distance between them and McMillan upon seeing northbound vehicles in front of McMillan. *Id.* at 582, 369 S.E.2d at 602-03.

The administrator of decedent's estate brought a wrongful death action against Officer Blakely, Sergeant Schmidt, and the City of Greensboro, alleging that the officers' conduct during the pursuit was "grossly or wantonly negligent and in reckless disregard of the rights and safety of others." *Id.* at 584, 369 S.E.2d at 604. The trial court denied defendants' motion for directed verdict at the close of all evidence. On discretionary review prior to a determination by the Court of Appeals, this Court reversed, holding as a *matter of law* that the facts presented did not constitute gross negligence or, for that matter, even ordinary negligence. *Id.*

In the instant case, the Court of Appeals attempts to distinguish the *Bullins* pursuit from the instant case in numerous ways, including: describing the chase in this case as "a brief and relatively slow chase by police of a dangerous drunk driver"; asserting that Hill's vehicle "gave them no sign—other than the speed in which it was going—that its driver had been drinking"; and opining that "I-85 is one of the busiest roadways in the State." However, the pursuit in *Bullins* covered eighteen miles, seven to eight miles *more* than the instant case, and reached top speeds of one hundred miles per hour. Furthermore, the fact that Hill did not exhibit signs of being drunk, other than his extreme speeds and reckless driving, is beside the point. In addition, it was approximately 2:00 a.m., and as the Court of Appeals accurately stated, Lieutenant Eubanks stated he passed only ten to twelve vehicles during the entire pursuit, while Hill said it was four to five vehicles. *Parish*, 130 N.C. App. at 202, 502 S.E.2d at 642.

The Court of Appeals attempts to further distinguish *Bullins* by opining that "it was an undisputed fact in *Bullins* that the police gave up the chase as soon as dangerous conditions arose." *Id.* This is simply a misstatement of the facts. In *Bullins*, the officers never "gave up the chase," but rather "reduced their speed and increased the distance between their vehicles and the McMillan vehicle" to where they

were 100 to 125 yards behind the violator. *Bullins*, 322 N.C. at 582, 369 S.E.2d at 603. In the instant case, this was precisely the situation Lieutenant Eubanks encountered during his pursuit of Hill. There is nothing in the record to suggest that either Lieutenant Eubanks or Officer Dean "forced" Hill to have an accident. Rather, similar to the facts of *Bullins*, the uncontested facts show that Lieutenant Eubanks discontinued any attempts to stop Hill after the tractor-trailer incident and that Officer Dean never actually pursued Hill. Rather than being distinguishable, the facts of *Bullins* are strikingly similar to those in the instant case.

### 2. *Fowler v. N.C. Dep't of Crime Control & Public Safety*:

Next, in *Fowler*, Master Trooper Bjorklund of the State Highway Patrol (Trooper Bjorklund) saw a vehicle traveling at approximately eighty miles per hour and, in the beginning, attempted to overtake the vehicle without activating his lights or siren. Once determining the vehicle ahead of him was in fact the vehicle he had observed earlier, Trooper Bjorklund activated his blue lights and siren. Shortly thereafter, he saw a dull orange flash on the horizon and discovered the pursued vehicle had crossed the center line and collided head on with another vehicle, killing the driver of the pursued vehicle and all three occupants of the second vehicle. *Fowler*, 92 N.C. App. at 733-34, 376 S.E.2d at 11-12.

The representatives of the decedents' estates filed a claim with the North Carolina Industrial Commission pursuant to the North Carolina Tort Claims Act seeking damages for Trooper Bjorklund's alleged negligence. The deputy commissioner concluded that Trooper Bjorklund was not negligent, and the Full Commission affirmed. On appeal, the Court of Appeals affirmed, holding that:

> Trooper Bjorklund followed a speeding vehicle for at least eight miles on a rural two-lane highway, at speeds of approximately 115 miles per hour, without activating either his siren or flashing blue light. Although we believe these facts to be more egregious than those of *Bullins*, [322 N.C. 580, 369 S.E.2d 601], we cannot say that they constitute gross negligence. The incident occurred around midnight in a sparsely populated area. [Trooper] Bjorklund testified that he encountered no vehicles [traveling] in the opposite, or westerly, direction, and saw only one vehicle other than the 1967 Chevrolet, which turned off of the highway shortly before he activated his siren and light.

These circumstances do not exemplify the degree of conscious or reckless indifference toward the safety of others necessary to establish gross negligence.

*Fowler*, 92 N.C. App. at 736, 376 S.E.2d at 13.

*Fowler* is significant in that the chase was initiated because of a speed limit violation, and the vehicle was speeding at eighty miles per hour—the *precise* speed Lieutenant Eubanks stated in his estimation the Hill vehicle was traveling on NC 86. Defendant Hill admits he was going at least seventy-five miles per hour. In addition, *Fowler* belies any notion that it is improper to pursue for the offense of speeding, indicating it is the public policy to protect law enforcement officers who attempt to apprehend motorists who are exceeding a safe speed.

As in its discussion of the distinctions between the instant case and the *Bullins* case, with respect to *Fowler*, the Court of Appeals states: "In *Fowler*, the suspect crashed his vehicle but a few seconds after the policeman turned on his blue lights; thus, there was no issue in that case as to whether the police 'forced' the suspect to have the accident, unlike here where there is some question as to whether defendant Hill was actively fleeing the police during the entire pursuit." *Parish*, 130 N.C. App. at 203, 502 S.E.2d at 643. However, as we will discuss later, the mere fact that Lieutenant Eubanks and Officer Dean were pursuing Hill's vehicle does not mean that they forced the accident.

### 3. *Clark v. Burke County*:

Next, in *Clark*, Deputy James Smith (Deputy Smith) of the Burke County Sheriff's Department responded to a call claiming a man had fired shots at a local arcade. The gunman had entered his vehicle, and Deputy Smith saw the vehicle leaving and pursued it. During the pursuit, Deputy Smith remained approximately four to five car lengths behind and kept his siren and blue lights activated. Upon learning that officers were coming to assist him, Deputy Smith continued the pursuit but made no effort to stop the vehicle. The pursued vehicle entered a curve at approximately seventy-five miles per hour; the driver did not apply his brakes, crashed into an abutment, and killed all three occupants. *Clark*, 117 N.C. App. at 87, 450 S.E.2d at 747-48. There was no evidence that Deputy Smith ever pulled beside the vehicle or tried to pass it or run it off the road. *Id.* at 87-88, 450 S.E.2d at 748. Deputy Smith admitted that he had to drive across the center line to maneuver the curve onto which the driver crashed.

**PARISH v. HILL**

[350 N.C. 231 (1999)]

The personal representative of one of the passengers killed in the crash filed a complaint against Burke County and the Burke County Sheriff in which she sought damages for wrongful death. The defendants answered and filed a motion for summary judgment, which subsequently was granted by the trial court. On appeal, the Court of Appeals stated that "[i]t seems [incredible] to suggest that such evidence might show negligence on Deputy Smith's part, and it certainly does not rise to the level of gross negligence." *Id.* at 91, 450 S.E.2d at 750.

In the instant case, the Court of Appeals attempted to distinguish *Clark* by stating that "it entailed a 3 mile pursuit, over an easy road with only one major curve, lasting just a few minutes and reaching speeds of only 75 miles per hour." *Parish*, 130 N.C. App. at 203, 502 S.E.2d at 643. However, we find that these minor differences in the case do not adequately distinguish *Clark* from the instant case.

### 4. *Young v. Woodall*:

Finally, in *Young*, this Court offered further guidance and explanation as to the sufficiency of the evidence of gross negligence. In *Young*, Officer Christopher Allen Woodall (Officer Woodall) of the Winston-Salem Police Department saw a Chevrolet Camaro approaching him with only one headlight. Officer Woodall began following the vehicle but did not activate his blue lights or siren, stating that if he had done so, it would have given the car he was following a better chance to elude him. His intent was to activate the lights and siren when he was closer to the vehicle. Officer Woodall claimed he did not know the speed at which he was traveling, but it might have been in excess of forty-five miles per hour, which was the posted limit. However, an eyewitness stated Officer Woodall was traveling at a high rate of speed, and the witness could not definitively say whether Officer Woodall's lights were on. While a yellow caution light was flashing in Officer Woodall's direction, he entered the intersection and struck Young's vehicle, which was turning left at the intersection. *Young*, 343 N.C. at 460, 471 S.E.2d at 358.

The trial court granted the motion for summary judgment as to the Police Department, but denied the motion as to the City and Officer Woodall. On appeal, the Court of Appeals affirmed in part and reversed in part, holding that the City and Officer Woodall were entitled to summary judgment based on sovereign immunity, except for negligence claims based on N.C.G.S. § 20-145. On discretionary review, this Court reversed the Court of Appeals' conclusion that the

City and Officer Woodall could be held liable for negligence pursuant to N.C.G.S. § 20-145. After considering all the evidence presented, this Court determined that while certain of Officer Woodall's discretionary acts may have been negligent, they did not rise to the level of gross negligence, and therefore the trial court should have granted summary judgment in his favor. *Id.* at 463, 471 S.E.2d at 360.

In the instant case, the Court of Appeals again attempted to distinguish the facts from those of *Young*, stating that "*Young* is distinguishable because the pursuing officer in that case crashed into the plaintiff's vehicle *before* the suspect even knew he was being chased," thereby negating the "chase" element involved in this case. *Parish*, 130 N.C. App. at 203, 502 S.E.2d at 643. However, as will be noted later, the subjective state of mind of the fleeing suspect is not important in these types of cases.

## B. Case *Sub Judice*:

The Court of Appeals appears to opine that summary judgment would no longer be proper in any police pursuit case where the suspect testified, or the evidence suggested, that he was aware of a continued pursuit at the time of the accident and was actively attempting to elude arrest. Such a holding would, in effect, shift the blame from the law violator to the law enforcer, a result which is contrary to our established jurisprudence. As the Seventh Circuit Court of Appeals has recognized:

> Death and disability haunt law enforcement. Lax law enforcement emboldens criminals and leads to more crime. Zealous pursuit of suspects jeopardizes bystanders and persons accompanying the offender. Easy solutions rarely work, and *ex post* assessments—based on sympathy for those the criminal has injured, while disregarding the risks to society at large from new restrictions on how the police work—are unlikely to promote aggregate social welfare.

*Mays v. City of East St. Louis, Ill.*, 123 F.3d 999, 1004 (7th Cir. 1997), *cert. denied*, —— U.S. ——, 141 L. Ed. 2d 137 (1998).

The Court of Appeals also seems to suggest that the state of mind of the fleeing suspect is somehow relevant to the determination of whether the pursuing officer's conduct was grossly negligent. We find this suggestion totally without merit. What the suspect may or may not have known is quite immaterial in the determination

**PARISH v. HILL**

[350 N.C. 231 (1999)]

of whether the pursuing officer's conduct rose to the level of gross negligence.

Furthermore, the Court of Appeals insinuates that by continuing the pursuit of a fleeing suspect at high speeds, the pursuing officer is somehow "forcing the accident," regardless of his conduct during that pursuit. However, the only North Carolina case to discuss the issue of forcing the accident specifically rejects the idea. *See Clark*, 117 N.C. App. 85, 450 S.E.2d 747. As set forth above, *Clark* involved a high-speed pursuit of a vehicle, wherein the pursuing officer was only four or five car lengths behind the suspect vehicle at the time of the accident and, according to one eyewitness, was narrowing the gap. *Id.* at 90-91, 450 S.E.2d at 749-50. In *Clark*, the Court of Appeals was unwilling to entertain a "forced" pursuit theory, stating: "It seems [incredible] to suggest that such evidence might show negligence on Deputy Smith's part, and it certainly does not rise to the level of gross negligence." *Id.* at 91, 450 S.E.2d at 750.

In the instant case, Lieutenant Eubanks and Officer Dean pursued defendant over a stretch of approximately ten miles of roadway, during a time of the day when traffic was very light. At no time did they attempt to overtake defendant's vehicle or force defendant's vehicle from the roadway. In fact, when defendant's vehicle crashed on US 70 on its way to Durham, Lieutenant Eubanks and Officer Dean were well behind defendant's vehicle and were traveling at a reduced speed.

In determining whether Lieutenant Eubanks' and Officer Dean's actions in the instant case rose to the level of gross negligence, it is important to remember the purpose behind such high-speed pursuits. As the United States Court of Appeals for the Seventh Circuit has stated:

> Political society must consider not only the risks to passengers, pedestrians, and other drivers that high-speed chases engender, but also the fact that if police are forbidden to pursue, then many more suspects will flee—and successful flights not only reduce the number of crimes solved but also create their own risks for passengers and bystanders.

*Mays*, 123 F.3d at 1003. Furthermore, the United States Supreme Court has recently spoken on the subject:

> [T]he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore

and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." [(quoting *Whitley v. Albers*, 475 U.S. 312, 320, 89 L. Ed. 2d 251, 261 (1986))]. A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects, their passengers, other drivers, or bystanders.

*County of Sacramento v. Lewis*, 523 U.S. 833, ——, 140 L. Ed. 2d 1043, 1061-62 (1998).

After a careful review, we conclude that plaintiff has failed to demonstrate either how the conduct of Lieutenant Eubanks or Officer Dean breached a duty owed to plaintiff's decedent, or the existence of a causal connection between the conduct and the accident. The fact remains that after Lieutenant Eubanks witnessed Hill driving his vehicle at an excessive speed on NC 86, he attempted to pursue Hill. When Hill saw that he was being followed, he attempted to evade arrest by increasing his speed. After Hill had already broken the law by exceeding the legal speed limit, he then attempted to flee from Lieutenant Eubanks' lawful pursuit. *See* N.C.G.S. § 20-141.5(a) (Supp. 1997) (effective 1 December 1997) (making such flight from law enforcement a new crime). While it certainly can be said that Hill increased his speed because of the pursuit by Lieutenant Eubanks and Officer Dean, the blame cannot be borne solely by the pursuing officers unless gross negligence is shown. We find it implausible to suggest that either Lieutenant Eubanks' or Officer Dean's conduct rose to the level of "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins*, 322 N.C. at 583, 369 S.E.2d at 603.

In summary, we conclude that plaintiff has failed to demonstrate any negligence on the part of Lieutenant Eubanks and Officer Dean, and certainly has not shown the degree of gross negligence required in order to hold the officers liable for the decedent's death. Therefore, there is no genuine issue of any material fact, and summary judgment was proper as a matter of law on behalf of Lieutenant Eubanks and Officer Dean in their official capacities. This case is remanded to the Court of Appeals with instructions to that court to

remand to the trial court for reinstatement of summary judgment in favor of defendants.

REVERSED.