EUNICE C. ECKARD, Executrix of the Estate of Steven Vincent Eckard, Deceased, and STATE OF NORTH CAROLINA, Ex. Rel., Eunice C. Eckard, Executrix of the Estate of Steven Vincent Eckard, Deceased, Plaintiffs v. CHANAE EVON SMITH, MARK STEPHEN McCOLLUM, STEVE WALLACE, PHILLIP H. REDMOND, Sheriff of Iredell County, HARTFORD FIRE INSURANCE COMPANY, and IREDELL COUNTY, Defendants

No. COA02-1379

(Filed 5 October 2004)

**1. Appeal and Error— appealability—interlocutory order— Rule 54(b) certification—writ of certiorari**

Although the two orders in a wrongful death action from which plaintiff has appealed are interlocutory orders based on the fact that plaintiff's claims against defendant Smith remain to be resolved, the Court of Appeals will hear both appeals, because: (1) the trial court's order granting summary judgment to the remaining defendants was certified under Rule 54(b); and (2) the Court of Appeals elects to treat plaintiff's purported appeal of the grant of summary judgment in favor of the unnamed insurance company as a petition for writ of certiorari to address the merits of the appeal in the interest of justice and judicial economy.

**2. Wrongful Death— vehicular police pursuit of law violator— gross negligence—moving roadblock**

The trial court did not err in a wrongful death action resulting from the vehicular pursuit of a law violator by granting summary judgment in favor of defendant law enforcement officers based on lack of evidence of gross negligence, because: (1) the officers had a compelling reason to apprehend defendant suspect, who had reportedly stolen a car by forcibly ejecting its occupant; (2) the identity of the suspect was not known to the officers when they initiated the chase; (3) law enforcement's ability to apprehend a known individual at a later date does not preclude a pursuit when officers have good reason to attempt to remove the driver from the road due to the immediate and significant potential danger to the public, and in the instant case defendant suspect appeared mentally unstable, had been throwing rocks at cars, stole a car, and was driving erratically; (4) the pursuit was not a high-speed chase, never exceeded the speed limit, and in fact decreased to 25 to 35 miles per hour just before the collision; (5) allegations that the officers acted in a grossly negligent man-

ner in ways that did not, in the end, play a substantial part in bringing about the collision cannot form the basis for liability, and in the instant case plaintiff failed to demonstrate any connection between the conduct and the accident that resulted in decedent's death; and (6) the pertinent officers' actions in initiating and performing a moving roadblock did not rise to a level of wanton conduct done with conscious or reckless disregard for the rights and safety of others.

3. **Statutes of Limitation and Repose— wrongful death—uninsured motorist carrier**

The trial court did not err by granting summary judgment in favor of the unnamed defendant uninsured motorist (UM) carrier based on expiration of the two-year statute of limitations applicable to wrongful death actions under N.C.G.S. § 1-53(4), because: (1) although N.C.G.S. § 20-279.21(b)(3)(a) does not specify a time limitation for service of the UM carrier, our Court of Appeals previously held that service must be accomplished within the statute of limitations applicable to the accident; (2) although plaintiff did have various alias and pluries summonses issued, those summonses did not preserve plaintiff's claim against the UM carrier when the individual defendants were personally served with the original summonses; (3) the UM carrier is not precluded from asserting the statute of limitations as a defense where plaintiff has not timely commenced her action against it even though the defense may not be available to the tortfeasor; (4) a claim against a UM carrier is actually one for the tort allegedly committed by the uninsured motorist, and thus, the statute of limitations applicable to the uninsured motorist controls as to the UM carrier as well; and (5) plaintiff failed to submit sufficient evidence to support a claim of equitable estoppel with respect to the unnamed insurance company's statute of limitations defense since plaintiff did not demonstrate that the unnamed insurance company acted intentionally or through culpable negligence to induce reliance by plaintiff.

Judge GEER concurring in part and dissenting in part.

Appeal by plaintiff executrix from order entered 5 June 2001 by Judge Sanford L. Steelman, Jr. in Iredell County Superior Court, and from order entered 17 April 2002 by Judge Mark E. Klass in Iredell County Superior Court. Heard in the Court of Appeals 21 August 2003.

**ECKARD v. SMITH**

[166 N.C. App. 312 (2004)]

*Starnes and Killian, PLLC, by Wesley E. Starnes; and Wilson, Lackey & Rohr, P.A., by David S. Lackey, for plaintiffs-appellants.*

*Kennedy Covington Lobdell & Hickman, LLP, by Wayne P. Huckel and Christopher L. Ekman, for defendants-appellees McCollum, Wallace, Redmond, Hartford Fire Insurance Company and Iredell County.*

*H. Brent Helms for unnamed defendant-appellee.*

BRYANT, Judge.

Eunice C. Eckard, plaintiff-executrix of Steven Vincent Eckard's (Mr. Eckard's) estate, appeals from two orders entered 5 June 2001 and 17 April 2002 granting summary judgment: one entered in favor of the law enforcement defendants Lt. McCollum, Chief Deputy Wallace, Sheriff Redmond, Iredell County and Hartford Fire Insurance Company (Iredell defendants); and the other entered in favor of the unnamed defendant uninsured motorist (UM) carrier, Indemnity Insurance Company of America (Indemnity Insurance).

On the afternoon of 13 August 1998, in Statesville, North Carolina, Sheriff's Deputy Eric Drye was flagged down by several people in a McDonald's parking lot. They told him that a woman—barefoot and wearing a medical bracelet—had been throwing rocks at cars in the parking lot, but that she was now headed toward the First Union Bank. Deputy Drye "took it as there was somebody that wasn't maybe in their right mind."

At the bank, Deputy Drye learned that the woman had again been throwing rocks at cars, but had since driven off in a stolen, white Chevrolet Blazer in the direction of a nearby Wal-Mart. Deputy Drye drove towards the Wal-Mart until he encountered what appeared to be the stolen Blazer. The driver of the Blazer seemed to be an unskilled driver; she was weaving back and forth, repeatedly running off the road and crossing the center line. Other vehicles moved out of the way to avoid being struck. The Blazer was, however, traveling within the speed limit. Following the Blazer north on Highway 21, Deputy Drye activated his emergency lights and sirens, but the Blazer refused to stop.

Responding to a call by Deputy Drye, Deputy David Gagnon attempted to stop the Blazer by positioning his car diagonally across the northbound lane of Highway 21. The Blazer swerved around his

car, and Deputy Gagnon fell in behind Deputy Drye with the two officers continuing to follow the Blazer north on Highway 21. As the Blazer exited Highway 21 onto the ramp for southbound I-77, the deputies once again tried to block the vehicle, but were unable to do so. The Blazer continued on I-77, driving erratically but within the posted speed limit.

The Blazer exited onto westbound I-40. Acting supervisor Lieutenant Mark McCollum had positioned his vehicle at the base of the I-40 on-ramp with his emergency lights and sirens activated. The Blazer swerved around him and collided with the left front quarter panel of his car. Lieutenant McCollum pulled in behind the Blazer, with Deputies Drye and Gagnon following behind him, and the pursuit continued on westbound I-40. There was "heavy citizen traffic" on I-40.

Shortly thereafter, Chief Deputy Steve Wallace joined the pursuit, pulling his unmarked vehicle in front of the Blazer. The Blazer had been traveling at about 55 miles per hour, but with Chief Deputy Wallace positioned in front of the Blazer, the cluster of vehicles slowed to 25 to 35 miles per hour. An audiotape indicates Chief Deputy Wallace radioed that they needed to "try to get a marked unit up beside here to box [her] in. We've gotta stop this." At that point, the Blazer was in the left lane of the highway, and Chief Deputy Wallace's and Lt. McCollum's vehicles were within a car's length in front of and behind the Blazer.

When the Blazer braked abruptly, Lt. McCollum's vehicle collided with the Blazer, causing the Blazer's trailer hitch to puncture the bumper of the police car and temporarily attach the two vehicles. The Blazer then swerved sharply left into the median. Lieutenant McCollum's car broke loose, and the Blazer collided head-on with the vehicle driven by Mr. Eckard, in an eastbound lane of I-40. Lieutenant McCollum's vehicle in turn struck several eastbound vehicles. A second deputy, also part of the pursuit, collided with yet another vehicle. Mr. Eckard died from injuries sustained in the accident.

The accident occurred in the early afternoon at approximately 2:00 p.m. The pursuit had covered 10 to 15 miles and lasted 12 to 15 minutes. The driver of the Blazer was identified as Chanae Evon Smith (Smith).

At the time of the accident, Smith was 17 years old and living with her parents. She had hitchhiked to Iredell Memorial Hospital on 12 August 1998, the day before the accident, for unspecified treatment,

ECKARD v. SMITH

[166 N.C. App. 312 (2004)]

but was released the same day. She then went to her pastor's house for spiritual guidance at least twice. On 13 August 1998, Smith again went to Iredell Memorial Hospital, but left on her own. As of 13 August 1998, Smith did not have a driver's license, had never driven a car, and was not insured.

On 8 August 2000, plaintiff filed a wrongful death action against defendant Smith and the Iredell defendants (defendants Lt. McCollum, Chief Deputy Wallace, Sheriff Phillip Redmond, Hartford Fire Insurance Co., and Iredell County). The Iredell defendants filed an answer on 9 October 2000; defendant Smith filed an answer on 13 October 2000.

On 16 November 2000, a copy of the complaint and copies of the summonses served on the defendants were sent by certified mail to the uninsured motorist (UM) carrier, Indemnity Insurance. On 19 February 2001, Indemnity Insurance filed its answer and motion to dismiss. Indemnity Insurance filed a renewed motion to dismiss on 25 May 2001 with a supporting affidavit, arguing that plaintiff failed to serve the UM carrier within the applicable statute of limitations. At the hearing on the motion to dismiss, Judge Sanford L. Steelman converted the motion into a motion for summary judgment and granted the motion in an order entered 5 June 2001.

The Iredell defendants filed a motion for summary judgment on 7 March 2002. In an order entered 17 April 2002, Judge Mark E. Klass granted the motion and, pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b), certified that the order was a final judgment as to all defendants except Smith and that there was no just reason for delay. On 25 April 2002, plaintiffs filed notice of appeal from Judge Steelman's and Judge Klass' orders.

*Interlocutory Nature of the Appeal*

[1] Because plaintiff's claims against defendant Smith remain to be resolved, the two orders from which plaintiff has appealed are interlocutory orders. *Embler v. Embler*, 143 N.C. App. 162, 164, 545 S.E.2d 259, 261 (2001) (an interlocutory order is an order made during the pendency of an action that does not dispose of the entire case). An interlocutory order is immediately appealable if either: (1) the trial court has certified the case for appeal under Rule 54(b) of the Rules of Civil Procedure; or (2) the challenged order affects a substantial right of the appellant that would be lost without immediate review. *Embler*, 143 N.C. App. at 165, 545 S.E.2d at 261.

Here, the trial court's order granting summary judgment to the Iredell defendants is properly before this Court based on the trial court's Rule 54(b) certification. The trial court entered final judgment as to the Iredell defendants, leaving only the claims against Smith to be tried, and found that "there is no just reason for delay."

The order granting judgment in favor of Indemnity Insurance, however, includes no Rule 54(b) certification. Although the burden is on the appellant to establish that a substantial right will be affected without an immediate appeal, *Embler*, 143 N.C. App. at 165, 545 S.E.2d at 262, plaintiff has not argued that his appeal from Judge Steelman's order implicates a substantial right and we can discern none. We note that plaintiff has failed to provide·"[a] statement of grounds for appellate review" in violation of Rule 28(b)(4). Nevertheless, under the unique circumstances of this case, we believe that justice and judicial economy will best be served by allowing an immediate appeal as to the Indemnity Insurance order and, therefore, we elect in our discretion to treat the purported appeal as a petition for writ of certiorari and to address the merits of the appeal. *Coca-Cola Bottling Co. Consol. v. Durham Coca-Cola Bottling Co.*, 141 N.C. App. 569, 574, 541 S.E.2d 157, 161 (2000).

---

The issues on appeal are whether the trial court properly granted summary judgment in favor of the: (I) Iredell defendants; and (II) UM carrier, Indemnity Insurance Company of America.

I

*Summary Judgment as to the Iredell Defendants*

[2] Plaintiff first contends that the trial court erred in granting summary judgment for the Iredell defendants. Defendants moved for summary judgment on the grounds that "[p]laintiffs' claims are subject to a standard of gross negligence, and the evidence viewed in the light most favorable to [p]laintiffs establishes that the conduct of the Iredell [d]efendants on August 13, 1998 did not rise to the level of gross negligence, as a matter of law."

Under Rule 56(c) of the Rules of Civil Procedure, summary·judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2003). The moving party has the

burden of establishing the absence of any genuine issue of material fact, and the trial court should view the evidence in the light most favorable to the nonmoving party. *Norris v. Zambito*, 135 N.C. App. 288, 293, 520 S.E.2d 113, 116 (1999). "[A]lthough it is seldom appropriate to grant summary judgment in a negligence action, it is proper if there are no genuine issues of material fact, and the plaintiff fails to demonstrate one of the essential elements of the claim." *Parish v. Hill*, 350 N.C. 231, 236, 513 S.E.2d 547, 550 (1999).

On appeal, this Court has the task of determining whether, on the basis of the materials presented to the trial court, there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. *Oliver v. Roberts*, 49 N.C. App. 311, 314, 271 S.E.2d 399, 401 (1980). We review the trial court's grant of summary judgment *de novo. Shroyer v. County of Mecklenburg*, 154 N.C. App. 163, 167, 571 S.E.2d 849, 851 (2002).

Our Supreme Court has held that "in any civil action resulting from the vehicular pursuit of a law violator, the gross negligence standard applies in determining the officer's liability." *Parish*, 350 N.C. at 238, 513 S.E.2d at 551. Since Mr. Eckard's death arose out of the deputies' pursuit of defendant Smith, who had stolen a vehicle, the question before this Court is whether plaintiff submitted sufficient evidence to permit a jury to conclude that defendants' conduct constituted gross negligence.

Gross negligence has been defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 61, 603 (1988). An act is wanton " 'when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.' " *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001) (quoting *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929)).

This Court pointed out in *Norris*, 135 N.C. App. at 294-95, 520 S.E.2d at 117-18, that our appellate courts have examined numerous factors in determining whether a police pursuit constituted gross negligence. These factors relate to a single issue: "the probability of injury to the public by the officers' decision to pursue and continue to pursue the suspect." *Norris*, 135 N.C. App. at 294, 520 S.E.2d at 117. The Court in *Parish* explained, however, that despite the risk of injury to the public, policy reasons exist for allowing pursuits:

ECKARD v. SMITH

[166 N.C. App. 312 (2004)]

"Political society must consider not only the risks to passengers, pedestrians, and other drivers that high-speed chases engender, but also the fact that if police are forbidden to pursue, then many more suspects will flee—and successful flights not only reduce the number of crimes solved but also create their own risks for passengers and bystanders."

*Parish*, 350 N.C. at 245, 513 S.E.2d at 555 (quoting *Mays v. City of East St. Louis, Ill.*, 123 F.3d 999, 1003 (7th Cir. 1997)). An officer "must conduct a balancing test, weighing the interests of justice in apprehending the fleeing suspect with the interests of the public in not being subjected to unreasonable risks of injury." *Parish*, 350 N.C. at 236, 513 S.E.2d at 550. "Gross negligence" occurs when an officer consciously or recklessly disregards an unreasonably high probability of injury to the public despite the absence of significant countervailing law enforcement benefits.

Plaintiff challenges as gross negligence (a) defendants' initial decision to pursue defendant Smith, (b) the continued pursuit after repeated unsuccessful efforts to cause her to stop, (c) the manner of conducting the pursuit, and (d) the efforts to force Smith to slow to a stop on I-40. We examine each of these contentions.

Plaintiff argues that the pursuit was unnecessary even though Smith's identity was unknown, because her identity could have been discovered and she could have been apprehended at a later date. In considering a decision to initiate a pursuit, a court must first look to the reason for the pursuit: "If the officer was attempting to apprehend someone suspected of violating the law, the police officer would fall squarely within the [gross negligence] standard of care." *Norris*, 135 N.C. App. at 294, 520 S.E.2d at 117. The court must then "consider whether the suspect was known to police and could be arrested through means other than apprehension via a high speed chase; or whether the fleeing suspect presented a danger to the public that could only be abated by immediate pursuit." *Id.* (internal citations omitted).

In the present case, the officers had a compelling reason to apprehend the suspect, who had reportedly stolen a car by forcibly ejecting its occupant. The identity of the suspect was not known to the officers when they initiated the chase. While Smith's identity could perhaps—but not certainly—have been ascertained by checking the records of nearby hospitals, this Court has already held that law enforcement's ability to apprehend a known individual at a later date does not preclude a pursuit when officers have "good reason to

attempt to remove [the driver] from the road due to the immediate and significant potential danger to the public." *Norris*, 135 N.C. App. at 295, 520 S.E.2d at 118. The evidence is undisputed that Smith appeared mentally unstable, she had been throwing rocks at cars, she stole a car, and she was driving very erratically. Given these circumstances, the decision to immediately pursue Smith, rather than to first engage in a possibly futile attempt to identify her, does not constitute gross negligence.

With respect to the continuation of the pursuit, the evidence is undisputed that the pursuit never exceeded the speed limit and, in fact, decreased to 25 to 35 miles per hour just before the collision. This was not a high-speed pursuit. The pursuit occurred in broad daylight on a dry, straight highway with no possibility of intersections. When these facts are compared to those of prior appellate decisions, we are compelled to hold that plaintiff has failed to demonstrate that continuation of the pursuit was gross negligence. *See, e.g., Parish*, 350 N.C. at 246, 513 S.E.2d at 555-56 (officer not grossly negligent where he pursued a vehicle at 2:00 a.m. in clear, dry conditions and light traffic on I-85 for five miles at speeds reaching 130 miles per hour); *Bullins*, 322 N.C. at 581-82, 369 S.E.2d at 602 (14 minute pursuit over 18 miles at speeds of 100 miles per hour on U.S. 220 was not plain negligence even though several vehicles had to pull off the road to avoid collision); *Norris*, 135 N.C. App. at 290, 520 S.E.2d at 115 (officer not grossly negligent where he chased the suspect at speeds of 70 miles per hour in a 35 mile per hour residential zone until the suspect ran a red light).

Plaintiff next points to various conduct that occurred during the course of the pursuit, including Chief Deputy Wallace's driving an unmarked car, Lt. McCollum's not having a standard light bar on his car, deputies attempting roadblocks without permission, an excessive number of deputies engaging in the pursuit, Chief Deputy Wallace's using two feet to drive, and Lt. McCollum's exceeding the speed limit in responding to the call regarding the pursuit. Plaintiff was required not only to prove that such conduct constituted gross negligence, but also to prove "the existence of a causal connection between the conduct and the accident." *Parish*, 350 N.C. at 246, 513 S.E.2d at 556; *see District of Columbia v. Walker*, 689 A.2d 40, 46 (D.C. App. 1997) ("[T]he primary focus must be not upon the conduct of the [police] officers in all its aspects, but only upon that particular conduct that might be said to have proximately caused the collision. Allegations that the officers acted in a grossly negligent manner

ECKARD v. SMITH

[166 N.C. App. 312 (2004)]

in ways that did not, in the end, play a substantial part in bringing about the collision cannot form the basis for liability."). Even if this conduct could be considered to exceed simple negligence, plaintiff has failed to demonstrate any connection between the conduct and the accident that resulted in Mr. Eckard's death. Plaintiff makes no argument that had defendants not engaged in this conduct, the accident would not have occurred.

Plaintiff's final challenge alleging gross negligence involves defendants' efforts to force Smith's Blazer to stop by means of a moving roadblock. Radio communications from Chief Deputy Wallace were interpreted to mean "that . . . [they] were going to try to box her in, try to slow her down and force her to the shoulder of the road or the emergency strip of the road." .

Lieutenant McCollum's written statement explained the intent in greater detail:

> Somewhere near the US 21/I-40 interchange Chief Deputy Wallace was able to position his patrol vehicle in front of the suspect vehicle; everyone was still traveling I-40[(W.)]. . . . As the pursuit neared the N.C. 115/I-40(W) interchange, Chief Wallace and myself were going to attempt to slow the pursuit down even more, and hopefully to an uneventful end. This was going to be attempted by Wallace staying in front of the suspect vehicle, and myself staying close behind the suspect vehicle; and for Wallace and myself gradually decreasing our speed to a steady even stop. In order to do this, Wallace and myself had to contain the suspect vehicle in a safe zone or "Box" between our 2 vehicles. Wallace began slowing his vehicle, the suspect was abruptly also slowing. I was likewise slowing my vehicle. We all decreased our speeds down to approximately 40 MPH. Wallace started slowing again, the suspect did not slow immediately, but did then begin. I moved my patrol vehicle close in order to tighten the safe zone or "Box" This would hopefully close off escape routes and bring everything to a safe conclusion.

This description of Chief Deputy Wallace's and Lt. McCollum's strategy matches up with Lt. McCollum's description of a "moving roadblock":

> The definition of a moving roadblock is surrounding of a vehicle that's failing to stop to the point to where you, whether they want to stop or not, force them to stop. You start slowing the speed down even if they don't wish to slow the speed down. . . . A mov-

ing roadblock ends up being the same [as a stationary roadblock], other than you try to surround this particular car or vehicle that's failing to stop with as many units as you can to where ideally it is totally encapsulated, and then it is forced to stop by the car in front bringing everything to a stop.

A jury could, based on this evidence, conclude that defendants Chief Deputy Wallace and Lt. McCollum were executing a moving roadblock with the intent of forcing the Blazer to stop on I-40. The question is whether this conduct constituted gross negligence under the circumstances.

While it appears our appellate courts have not yet specifically addressed moving roadblocks, there is nothing in our jurisprudence that requires application of a different standard of gross negligence in evaluating facts surrounding a moving roadblock versus other types of police pursuits. Therefore we analyze moving roadblocks as we would any other type of police pursuit, using the standard of gross negligence generally applied to police pursuit cases. As previously noted, gross negligence occurs when an officer consciously or recklessly disregards an unreasonably high probability of injury to the public despite the absence of significant countervailing law enforcement benefits.

In the instant case, the facts indicate that the relevant stretch of I-40 on which the moving roadblock occurred that day was dry and in good condition, it was a straight stretch of road with rolling hills, the weather was sunny and clear, and traffic was moderate to heavy. At all times during the pursuit, including during the moving roadblock, all of the defendants had their blue lights flashing and their sirens on. The pursuit of Smith on I-40 lasted for only three miles, and was at all times at or below the posted speed limit, with a speed of only 25 m.p.h. just prior to the accident. The dissent focuses on the fact that traffic on I-40 that afternoon was moderate to heavy, a fact that *may* lead a jury to believe initiating a moving roadblock at that time was grossly negligent. However, the amount of traffic could also be considered as a motivating factor in the defendants' decision to initiate a moving roadblock, thereby reducing the possibility of injury to other motorists on I-40 that day.

Lieutenant McCollum and Chief Deputy Wallace attempted to control defendant Smith's movement by slowing her down, trying to cushion her from other motorists on the road by placing officers in front of and behind her vehicle. Smith's "unskilled" and "erratic" driv-

ECKARD v. SMITH

[166 N.C. App. 312 (2004)]

ing, and the fact that she struck an officer's vehicle while merging onto I-40, was sufficiently alarming such that the officers needed to do more than simply follow her; they needed to reduce the immediate and significant danger Smith posed to other motorists.

During the moving roadblock, all of the officers involved maintained control of their vehicles with the exception of Lt. McCollum, who lost control of his vehicle when Smith suddenly started braking. However, Lt. McCollum's loss of control of his vehicle under these circumstances is significantly less severe than that of the officer in *Bray v. N.C. Dep't of Crime Control & Public Safety*, 151 N.C. App. 281, 564 S.E.2d 910 (2002). In *Bray*, the officer lost control of his vehicle while engaged in a high speed pursuit. He was determined to have been speeding excessively on a curving rural road when he crossed the center line, striking and injuring a civilian motorist. However, his actions in pursuing a suspect were not found to be wanton conduct constituting gross negligence. *Bray*, 151 N.C. App. at 283, 564 S.E.2d at 912. In the instant case, Lt. McCollum's actions, when compared with those of the officer in *Bray*, do not rise to the level of wanton conduct constituting gross negligence.

Based on the dissent's analysis, any moving roadblock would constitute evidence of gross negligence, as there is almost always a substantial risk of collision or "high liability." The defendants here recognized there was a potential danger to civilians associated with a moving roadblock, just as there is with any pursuit. However, they conducted the moving roadblock in such a manner that it lasted for only about three miles and was undertaken at relatively low speeds. Our Supreme Court has held that " 'police officers have a duty to apprehend lawbreakers and society has a strong interest in allowing the police to carry out that duty without fear of becoming insurers for the misdeeds of lawbreakers.' " *Parish*, 350 N.C. at 236, 513 S.E.2d at 550 (citation omitted). Police officers are required " 'to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." ' " *Parish*, 350 N.C. at 246, 513 S.E.2d at 556 (citations omitted).

North Carolina's standard of gross negligence, with regard to police pursuits, is very high and is rarely met.[1] Unless we are to

---

1. *See Parish*, 350 N.C. 231, 513 S.E.2d 547 (police pursuit that reached speeds of 120 to 130 m.p.h., and passed multiple civilian motorists on interstate, did not constitute gross negligence); *Young v. Woodall*, 343 N.C. 459, 471 S.E.2d 357 (1996) (police pursuit at 2:00 a.m., in which officer exceeded posted speed limit, did not activate his

impose a different and higher standard for police pursuits involving moving roadblocks, the facts in the instant case cannot be distinguished from our present case law. Defendants Chief Deputy Wallace and Lt. McCollum's actions in initiating and performing a moving roadblock do not rise to a level of "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Bullins*, 322 N.C. at 583, 369 S.E.2d at 603. Viewing the evidence in the light most favorable to plaintiffs, we agree with the trial court that plaintiffs have failed to establish that the actions of the Iredell defendants rose to the level of gross negligence as a matter of law. Accordingly, this assignment of error is overruled.

*Uninsured Motorist (UM) Carrier*

[3] Plaintiff contends that her claim against the uninsured motorist (UM) carrier Indemnity Insurance is not barred by the two-year statute of limitations applicable to wrongful death actions. We disagree.

N.C. Gen. Stat. § 20-279.21(b)(3)(a), provides that in order for a UM carrier to be bound by a judgment against the uninsured motorist, the insurer must be "served with copy of summons, complaint or other process in the action against the uninsured motorist by registered or certified mail, return receipt requested, or in any manner provided by law." N.C.G.S. § 20-279. 21(b)(3)(a) (2003). Once the insurer is properly served, it becomes "a party to the action between the insured and the uninsured motorist though not named in the caption of the pleadings and may defend the suit in the name of the uninsured motorist or in its own name." *Id.*

---

siren or blue lights, did not notify his dispatcher, and struck a civilian motorist, did not constitute gross negligence); *Bray*, 151 N.C. App. at 283, 564 S.E.2d at 912 (police pursuit in which officer caused an accident, after speeding excessively and crossing the center line on a curving rural road, did not constitute gross negligence); *Bray*, 151 N.C. App. at 284, 564 S.E.2d at 912 (quoting *Young*, 343 N.C. at 463, 471 S.E.2d at 360) (officer's pursuit of a suspect " 'without activating the blue light or siren, his entering the intersection while the caution light was flashing, and his exceeding the speed limit were acts of discretion on his part which may have been negligent but were not grossly negligent' "); *Norris*, 135 N.C. App. 288, 520 S.E.2d. 113 (police pursuit at speed of 70 m.p.h. in a 35 m.p.h. zone, where suspect ran a red light and struck and killed a civilian motorist, did not constitute gross negligence); *Clark v. Burke County*, 117 N.C. App. 85, 450 S.E.2d 747 (1994) (police pursuit at 75 m.p.h. in a 45 m.p.h. zone resulting in an accident in which the passengers in the suspect vehicle were killed, did not constitute gross negligence); *Fowler v. N.C. Dep't of Crime Control & Pub. Safety*, 92 N.C. App. 733, 736, 376 S.E.2d 11, 13 (1989) (officer's pursuit of a suspect at speeds of approximately 115 m.p.h., "without activating either his siren or flashing blue lights," did not constitute gross negligence).

Although the statute does not specify a time limitation for service of the UM carrier, this Court in *Thomas v. Washington*, 136 N.C. App. 750, 525 S.E.2d 839 (2000), held that service must be accomplished within the statute of limitations applicable to the accident. *Thomas*, 136 N.C. App. at 754, 525 S.E.2d at 842 ("the three-year tort statute of limitations, which begins running on the date of an accident, also applies to the uninsured motorist carrier"). More recently, this Court held: "In requiring the UM carrier to be included in the underlying tort action, the legislature intended to subject the insured's action against the carrier to the statute of limitations for the tort claim." *Sturdivant v. Andrews*, 161 N.C. App. 177, 179, 587 S.E.2d 510, 511 (2003).

Because plaintiff has sued for wrongful death, the applicable statute of limitations is two years. N.C.G.S. § 1-53(4) (2003). The accident occurred on 13 August 1998 and the statute of limitations, therefore, ran on 13 August 2000. Plaintiff filed suit against Smith and the Iredell defendants on 8 August 2000. Defendants were all served with the complaint and original summonses no later than 17 August 2000. It is undisputed that plaintiff did not serve Indemnity Insurance with the complaint and summonses until 16 November 2000. Under *Thomas* and *Sturdivant*, plaintiff's UM claim is barred by the statute of limitations.

Although plaintiff did have various alias and pluries summonses issued, this Court in *Thomas* held that those summonses did not preserve plaintiff's claim against the UM carrier when, as here, the individual defendants were personally served with the original summonses. *Thomas*, 136 N.C. App. at 755, 525 S.E.2d at 843. In addition, contrary to plaintiff's suggestion, it is irrelevant that the uninsured motorist, defendant Smith, has no statute of limitations defense because she was timely sued. *Reese v. Barbee*, 129 N.C. App. 823, 827, 501 S.E.2d 698, 701 (1998), *aff'd by equally divided court*, 350 N.C. 60, 510 S.E.2d 374 (1999) ("[The UM carrier] is not precluded from asserting the statute of limitations as a defense where plaintiff has not timely commenced her action against it, even though the defense may not be available to the tort-feasor.").

Plaintiff argues further that the statute of limitations should not begin to run as to the UM carrier until the plaintiff has discovered the identity of the UM carrier. She contends that *Thomas* should be limited to cases in which the UM carrier is known by the plaintiff. This argument cannot be reconciled with the rationale underlying *Thomas* and *Sturdivant*. Those opinions squarely reject the proposition that a separate statute of limitations applies to a claim against the UM car-

rier and hold that the statute of limitations commences running at the same time as to both the UM motorist and the UM carrier.

This rationale is also compelled by the Supreme Court's opinions in *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 573 S.E.2d 118 (2002) and in *Brown v. Lumberman's Mut. Casualty Co.*, 285 N.C. 313, 204 S.E.2d 829 (1974). In *Pennington*, the Court wrote:

> In the situation where a tortfeasor has no liability insurance coverage, the injured insured's UM carrier generally would be the only insurance provider exposed to liability for the insured's claim for damages. As such, it follows that the UM provider need be made a party to the suit and be served with a copy of the summons and complaint *within the statute of limitations governing the underlying tort.*

*Pennington*, 356 N.C. at 577, 573 S.E.2d at 122 (emphasis added). Likewise, in *Brown*, the Court explained that a claim against a UM carrier "is actually one for the tort allegedly committed by the uninsured motorist." *Brown*, 285 N.C. at 319, 204 S.E.2d at 834. For that reason, the statute of limitations applicable to the uninsured motorist controls as to the UM carrier as well.

Alternatively, plaintiff argues that Indemnity Insurance should be estopped from asserting the defense of the statute of limitations. Plaintiff has submitted evidence that the accident report listed the name of the insurance company for the vehicle driven by Mr. Eckard (and owned by his employer) as "Indemnity of North America." An employee of the Department of Insurance informed a paralegal for plaintiff's counsel that no such insurance company or any similarly named company was licensed in North Carolina. Plaintiff's counsel sent a letter on 30 September 1998 to the owner of the vehicle requesting a copy of the policy or the name of the insurance company, but never received a response. Shortly after this action was filed, the paralegal again contacted the Department of Insurance and was notified that an insurance company named Indemnity Insurance Company of North America was in fact licensed in North Carolina. Based on the initial communication with the Department of Insurance, plaintiff suggests that at the time the complaint was filed, Indemnity Insurance was not licensed or authorized as required by N.C. Gen. Stat. § 20-279.20(a).

"Equitable estoppel arises when [a party] by [its] acts, representations, admissions, silence, or when [it] has a duty to speak, inten-

ECKARD v. SMITH

[166 N.C. App. 312 (2004)]

tionally or through culpable negligence, induces another to believe that certain facts exist and that the other person rightfully relies on those facts to his detriment." *Pierce v. Johnson*, 154 N.C. App. 34, 43, 571 S.E.2d 661, 667 (2002). Equitable estoppel may be invoked, in a proper case, to bar a defendant from relying upon the statute of limitations. *Duke University v. Stainback*, 320 N.C. 337, 341, 357 S.E.2d 690, 692 (1987) (holding that the defendant was estopped from pleading the statute of limitations as a defense when his attorney's conduct misled the plaintiff and reasonably caused the plaintiff to refrain from suing the defendant).

Here, plaintiff has failed to demonstrate that Indemnity Insurance acted intentionally or through culpable negligence to induce reliance by plaintiff. The hearsay statements in the affidavit reporting the paralegal's initial conversation with the Department of Insurance do not by themselves constitute competent evidence that Indemnity Insurance was in fact unlicensed at the time of the filing of the complaint. Plaintiff has not, therefore, submitted sufficient evidence to support a claim of equitable estoppel with respect to Indemnity Insurance's statute of limitations defense.

## Conclusion

We affirm the trial court's order granting summary judgment for the Iredell defendants and Indemnity Insurance.

Affirmed.

Judge McGEE concurs.

Judge GEER concurs in part, dissents in part.

GEER, Judge, concurring in part and dissenting in part.

I concur fully with the majority opinion as to plaintiff's claims against the uninsured motorist carrier, Indemnity Insurance. With respect to the claims asserted against the Iredell defendants, I agree that plaintiff failed to demonstrate gross negligence in defendants' decision to initiate and continue the pursuit of Chanae Smith, but I would hold that plaintiff's evidence creates an issue of fact as to whether defendants McCollum and Wallace executed a moving road-block to force Smith to stop and whether, in doing so, they were grossly negligent.

I believe that plaintiff's evidence—elicited from defendants themselves—that there was a 90% chance of an accident resulting from the maneuver, that the pursuit was surrounded on either side by "heavy citizen traffic," and that there was no need to stop Smith at that particular spot on I-40 is sufficient evidence to permit a jury to find defendants grossly negligent. If a 90% chance of an accident in the midst of heavy traffic, as a matter of law, cannot prove gross negligence, then it is difficult to imagine what evidence would be enough. Accordingly, I would reverse the trial court's order granting summary judgment to the Iredell defendants.

As the majority acknowledges, when the evidence is viewed in the light most favorable to the plaintiff, it would permit a reasonable juror to conclude that defendants Wallace and McCollum intended to terminate the pursuit on I-40 by forcing the Blazer to a stop through a moving roadblock. While defendants deny performing a moving roadblock and claim that "[a]t most, the Iredell Defendants were trying to contain the Blazer by maintaining a box between it and civilian traffic[,]" this assertion ignores the requirement that the evidence be viewed in the light most favorable to the plaintiff. A jury could construe Wallace's radio transmission about moving a marked unit up to "stop this" as expressing a desire to force the Blazer to stop. Deputy Drye understood Wallace to mean "that . . . we were going to try to box her in, try to slow her down and force her to the shoulder of the road or the emergency strip of the road."

Lt. McCollum's written statement explained the intent in greater detail:

> Somewhere near the US 21/I-40 interchange Chief Deputy Wallace was able to position his patrol vehicle in front of the suspect vehicle, everyone was still traveling I-40-W. . . . As the pursuit neared the NC 115/I-40(W) interchange, Chief Wallace and myself were going to attempt to slow the pursuit down even more, *and hopefully to an uneventful end*. This was going to be attempted by Wallace staying in front of the suspect vehicle, and myself staying close behind the suspect vehicle; and for Wallace and myself gradually decreasing our speed *to a steady even stop*. In order to do this, Wallace and myself had to contain the suspect vehicle in a safe zone or "Box", between our 2 vehicles. Wallace began slowing his vehicle, the suspect was abruptly also slowing. I was likewise slowing my vehicle. We all decreased our speeds down to approximately 40 MPH. Wallace started slowing again, the suspect did not slow immediately, but did then begin. I moved

my patrol vehicle close in order to tighten the safe zone or "Box". *This would hopefully close off escape routes and bring everything to a safe conclusion.*

(Emphasis added) This description of Wallace's and McCollum's strategy matches up with Lt. McCollum's description of a "moving roadblock":

*The definition of a moving roadblock is surrounding of a vehicle that's failing to stop to the point to where you, whether they want to stop or not, force them to stop.* You start slowing the speed down even if they don't wish to slow the speed down. . . . A moving roadblock ends up being the same [as a stationary roadblock], other than you try to surround this particular car or vehicle that's failing to stop with as many units as you can to where ideally it is totally encapsulated, and then *it is forced to stop by the car in front bringing everything to a stop.*

(Emphasis added) I believe that a jury could, based on this evidence, conclude that defendants Wallace and McCollum were executing a moving roadblock with the intent of forcing the Blazer to stop on I-40.

The majority and I differ on the question whether evidence of this conduct, under the circumstances, is sufficient to prove gross negligence. Although no prior North Carolina appellate opinion has found sufficient evidence of gross negligence in a police pursuit case, I believe the evidence in this case regarding the attempted moving roadblock was sufficient to survive defendants' motion for summary judgment.

First, our appellate courts' prior opinions have not addressed moving roadblocks or other attempts to bring the fleeing vehicle to a halt. In fact, in finding no gross negligence, our courts have specifically relied upon the fact that officers kept their distance from the fleeing vehicle and on the lack of evidence that officers tried to force the fleeing vehicle to stop. Thus, in *Parish v. Hill*, 350 N.C. 231, 245, 513 S.E.2d 547, 555 (1999), the Supreme Court cited the following facts as dispositive on the question of gross negligence:

In the instant case, [the officers] pursued defendant over a stretch of approximately ten miles of roadway, during a time of the day when traffic was very light. At no time did they attempt to overtake defendant's vehicle or force defendant's vehicle from the roadway. In fact, when defendant's vehicle crashed on US 70

on its way to Durham, [the officers] were well behind defendant's vehicle and were traveling at a reduced speed.

*See also Bullins v. Schmidt*, 322 N.C. 580, 582, 369 S.E.2d 601, 602-03 (1988) (by the time of the accident, officers had reduced their speed and increased the distance between them and the fleeing vehicle because of the presence of other vehicles); *Clark v. Burke County*, 117 N.C. App. 85, 90, 450 S.E.2d 747, 748 (1994) (there was no evidence that the officer ever pulled beside the vehicle or tried to pass it or run it off the road). Here, by contrast, a jury could find that defendants McCollum and Wallace were attempting to force the Blazer from the road, and, to achieve that purpose, they were each less than a car's length from the Blazer when they sandwiched the car.

Second, plaintiff also offered evidence that defendants knew that a moving roadblock created a substantial hazard. Lt. McCollum testified that with a moving roadblock, "[n]ine times out of ten, there's going to be some contact with other units around or civilians" if the fleeing vehicle does not wish to slow down. He acknowledged, "That's why there's a high liability issue." In addition, after Wallace's radio transmission, there was discussion over the radio about choosing an older patrol car to move up next to the Blazer, suggesting defendants expected that there would likely be a collision. Yet, according to plaintiff's evidence, defendants did not wait until a patrol car could move alongside before attempting to force the Blazer to stop.

Third, the jury could take into account the fact that the officers initiated the moving roadblock maneuver, with its 90% chance of collision, at a time when the traffic was heavy and moving at significant speeds. No prior case has involved the degree of traffic present in this case. *See, e.g., Bullins*, 322 N.C. at 584, 369 S.E.2d at 604 ("traffic was light and the road was dry"); *Norris v. Zambito*, 135 N.C. App. 288, 291, 520 S.E.2d 113, 115 (1999) ("the roads were in good condition and free of other motorists"); *Fowler v. N.C. Dep't of Crime Control & Pub. Safety*, 92 N.C. App. 733, 736, 376 S.E.2d 11, 13, *disc. review denied*, 324 N.C. 577, 381 S.E.2d 773 (1989) (trooper encountered only one other vehicle during pursuit). While the amount of traffic did not necessarily, given the circumstances of this case, mean that the pursuit itself was gross negligence, a jury could view an attempt to execute a moving roadblock in heavy citizen traffic as being grossly negligent. As defendants acknowledge, the pursuit was in the left lane immediately prior to the accident, but the flow of traffic in the right

**ECKARD v. SMITH**

[166 N.C. App. 312 (2004)]

lane made it impossible for a marked unit to move up alongside the Blazer in the right lane. Plaintiff's evidence would permit the jury to conclude that defendants effectively allowed the civilian traffic in the right lane to serve as a side of the "box" for the moving roadblock.

The evidence also indicates that defendants knew (1) that there was a strong possibility that defendant Smith would change lanes or otherwise move sideways; and (2) Smith did not fear a collision. Defendant Wallace reported that while he was in front of the Blazer, it was "jerking from side to side within the lane, changing lanes, you know, obviously a danger." At times, the Blazer's left tires fell off the pavement and into the relatively narrow median before returning to the pavement. According to defendant Wallace, the Blazer "would turn sharply from side to side" and "would run up behind" his vehicle. Defendant Wallace also believed that the Blazer attempted to hit him from behind.

Thus, the record contains evidence that would allow, but not require, a jury to find that defendants were executing a moving road-block with the intent of forcing the Blazer to stop while in the left-hand lane of I-40; that defendants knew that a moving roadblock with an uncooperative suspect would result in a collision 90% of the time; that defendants did not wait until the Blazer, which had been weaving between lanes and into the median, could be surrounded by patrol cars; and that defendants proceeded with the moving roadblock despite heavy citizen traffic in the right lane and across the relatively narrow median. This evidence would permit a jury to conclude that there was a high probability of injury to the public from the execution of the moving roadblock.[2]

I agree with the majority that the probability of injury from the moving roadblock must be weighed against any law enforcement need to terminate the pursuit at that point on I-40. Defendants have, however, pointed to no reason that they needed to stop the Blazer at the point on I-40 where the accident occurred rather than wait until a more rural setting when traffic had cleared. Instead, they have argued

2. The majority appears to misconstrue the nature of a "moving roadblock" when it states that defendants "conducted the moving roadblock in such a manner that it lasted for only about three miles and was undertaken at relatively low speeds." The majority mistakes the pursuit with Wallace in front and McCollum behind the Blazer for the moving roadblock. As McCollum's testimony explained, a "moving road-block" is an attempt to force a vehicle to stop. It is a form of roadblock. The risk here did not arise from the low-speed pursuit, but from the decision to try to force the Blazer to stop.

that there was no effort to halt the Blazer and that they were, in fact, trying to continue the pursuit and protect the public from a collision with the Blazer. As explained above, that is an issue of fact for the jury to decide.

The majority opinion attempts to supply the missing evidence, stating: "The dissent focuses on the fact that traffic on I-40 that afternoon was moderate to heavy, a fact that *may* lead a jury to believe initiating a moving roadblock at that time was grossly negligent. However, the amount of traffic could also be considered as a motivating factor in the defendants' decision to initiate a moving roadblock, thereby reducing the possibility of injury to other motorists on I-40 that day." Although this supposition appears to conflict with the requirement that this Court view all evidence and draw all inferences in favor of the non-moving party, it also conflicts with defendants' own brief. Defendants stated: "[T]he risks to continuing the pursuit were attenuated by the moderate speed, the absence of cross intersections or traffic signals, the one-way flow of traffic, and the clear road conditions." In addition, Wallace testified that he heard a deputy report over the radio that the deputies could have "put her in the ditch. But at that point she had not done anything to warrant that type of activity." Another deputy testified in his deposition that Smith's erratic driving did not justify forcing her into a ditch—one of the outcomes of a moving roadblock. Thus, even if defendants had relied upon the law enforcement reason articulated by the majority opinion, plaintiff offered evidence that placed the legitimacy of that reason in dispute.

The majority also points to the fact that only one officer lost control of the vehicle during the execution of the moving roadblock. Since the risk, as defendant McCollum testified, was from the recalcitrant driver being pursued, I do not understand how the fact that only one officer lost control establishes a lack of gross negligence as a matter of law. *Bray v. N.C. Dep't of Crime Control & Pub. Safety*, 151 N.C. App. 281, 564 S.E.2d 910 (2002), cited by the majority, does not support the result reached by the majority opinion. In *Bray*, this Court was reviewing a decision by the Industrial Commission under the State Tort Claims Act—the equivalent of reviewing a jury verdict. *Bray* cannot support the granting of a motion for summary judgment. Moreover, the plaintiff in *Bray* argued only that the trooper's crossing of the middle line on a rural road while conducting a high speed pursuit constituted gross negligence. *Bray* did not address a decision to force a car to stop on a

COASTAL PLAINS UTILS., INC. v. NEW HANOVER CTY.

[166 N.C. App. 333 (2004)]

heavily-traveled interstate when, viewing the evidence in the light most favorable to the plaintiff, there was no need to stop the car at that point.

I would reverse the trial court's grant of summary judgment because I believe plaintiff forecast sufficient evidence to permit a reasonable juror to find that defendants were grossly negligent in attempting to perform a moving roadblock under the existing circumstances, especially given that defendants have offered no evidence of any legitimate law enforcement reason for attempting to stop the Blazer in the midst of heavy citizen traffic.