***********
The Full Commission reviewed the prior Interlocutory Decision and Order based upon the record of the proceedings before Chief Deputy Commissioner Gheen, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Decision and Order and enters the following Decision and Order.
 *********** *Page 2 
The record in this case consists of exhibits received into evidence and testimony from the criminal trial of Larry Wynton Doyle. The forecast of the facts giving rise to this claim showed the following:
 FINDINGS OF FACT
1. Plaintiff in this claim is Kelly Curran, Personal Representative of the estate of Michelle Curran (hereafter "decedent").
2. In her Affidavit, plaintiff alleges that the negligent acts of defendant's named employees, North Carolina Highway Patrol Officer William Gardner and Line Sergeant M.D. Wike, caused the wrongful death of decedent in a motor vehicle accident on April 14, 2002.
3. In its Answer, defendant denied any negligence and moved to dismiss plaintiff's claim based upon the public duty doctrine. Chief Deputy Commissioner Gheen conducted a motions hearing on February 8, 2006. This matter is before the Full Commission upon defendant's appeal of the Chief Deputy Commissioner's Interlocutory Decision and Order denying defendant's motion to dismiss.
4. At approximately 4:00 p.m. on April 14, 2002, a male suspect later identified as Larry Wynton Doyle stole a motor vehicle at knifepoint from the owner in a Wal-Mart parking lot in Asheville, North Carolina. In exiting the parking lot, Doyle collided with another vehicle and stopped to pickup a female companion.
5. Mr. Doyle proceeded to I-40 headed in a westerly direction from Asheville.
6. Asheville Police Department officers detected Doyle's vehicle and began pursuit of the suspect, initiating blue lights and sirens. Mr. Doyle failed to stop, and instead entered the left lane of I-40 and increased speed. *Page 3 
7. Other law enforcement agencies entered into the pursuit, including a Department of Motor Vehicles officer, a deputy with the Haywood County Sheriff's Department, and troopers of the North Carolina Highway Patrol.
8. An attempt was made at Exit 27 of I-40 to have an officer pull out in front of the fleeing suspect in order terminate the suspect's flight. The attempt was unsuccessful, as the officer could not pull in front of Doyle's vehicle, which was traveling at a high rate of speed estimated at various points as between 80 mph and 110 mph.
9. Sergeant Wike of the North Carolina Highway Patrol then instructed Troopers Travis M. Crisp, William W. Gardner, and William D. Franklin III to deploy a tire deflation device or "stop sticks" at Exit 24 of I-40. This section of I-40 was chosen because the road at that point has a slight curve to the right with approximately 1,800 feet of sight distance approaching the curve. Stop sticks are designed to bring a vehicle to a stop by puncturing tires and causing a controlled deflation.
10. Trooper Gardner was assigned to deploy a stop stick in the left hand lane of I-40, while Troopers Crisp and Franklin were assigned to deploy stop sticks in the right hand lane and adjoining paved shoulder.
11. Troopers Crisp and Franklin parked their vehicles at the entrance of the eastbound exit ramp of Exit 24.
12. Trooper Gardner parked his vehicle with all emergency lights activated facing east in the median between east and west bound lanes. The left lane of I-40 at this point had a guardrail running parallel to the roadway. Trooper Franklin's vehicle was immediately across from Trooper Gardner's vehicle. *Page 4 
13. Sergeant Wike, who was a part of the pursuit of the suspect from the rear, provided radio updates to all three Troopers.
14. Decedent was a passenger in a motor vehicle being operated in the right hand lane of I-40 approaching Exit 24. A tractor-trailer truck immediately followed decedent's vehicle in the right lane.
15. Doyle approached the troopers at approximately 80 mph to 85 mph, pursued by law enforcement vehicles with their emergency lights and sirens activated. Doyle continued in the left lane, overtaking the vehicle in which decedent was a passenger and the tractor-trailer. Troopers Crisp and Franklin did not deploy their stop sticks based on the proximity of decedent's vehicle and the tractor-trailer. As all the vehicles approached the stationary troopers, the tractor-trailer exited the highway, while decedent's vehicle slowed and appeared to be headed toward the shoulder on the right side of the highway.
16. Trooper Gardner deployed his stop stick in the left lane approximately 75 to 100 yards in front of Doyle's vehicle. Precedent to the deployment of the stop stick, Trooper Gardner was under the impression that decedent's vehicle had slowed to approximately 50 or 55 mph. Trooper Gardner was aware of the relative positions of decedent's vehicle and the tractor-trailer in regard to Doyle and their respective approach times to the site chosen for deployment of the stop stick, and testified that his attention was on Doyle's vehicle as he began to execute deployment of the stop sticks. Trooper Gardner attempted to gauge when to deploy the stop sticks to eliminate the possibility that Doyle would maneuver around the stop sticks.
17. Upon the deployment of the stop sticks by Trooper Gardner, Doyle swerved to the right to avoid the stop sticks, heading toward Troopers Franklin and Crisp who ran to protect themselves but were hit by flying glass from the crash. Doyle collided with decedent's vehicle, *Page 5 
which slid into the grassy area and came to rest facing north on the right shoulder of the highway. Law enforcement vehicles were also involved in the collision.
18. Decedent subsequently died as a result of the injuries she sustained in the vehicular collision.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The purpose of the public duty doctrine, as recognized by the Supreme Court of North Carolina in Braswell v. Braswell, 330 N.C. 363,370, 410 S.E.2d 897, 901 (1991), is to recognize "the limited resources of law enforcement":
 The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources . . . should be allocated and without predictable limits.
Id. at 371, 410 S.E.2d at 901. Thus, as it is described under Braswell, the public duty doctrine protects the right of a law enforcement agency to allocate its resources as it sees fit, and the agency cannot be held liable for an injury arising from its decision to deploy its resources in one manner instead of another.
2. In accordance with Braswell, the North Carolina courts have consistently and nearly universally applied the public duty doctrine only where a governmental agency has failed to allocate its resources in such a manner as to protect the plaintiff from injury. See Watts v.North Carolina Dept. of Environment and Natural Resources, ___ N.C. App. ___, 641 S.E.2d 811 (2007) (alleged failure to adequately inspect property); Myers v. McGrady, 360 N.C. 460, *Page 6 628 S.E.2d 761 (2006) (alleged failure to adequately control forest fire); and Cockerham-Ellerbee v. Town of Jonesville, 176 N.C. App. 372,626 S.E.2d 685 (2006) (alleged failure to adequately enforce protective order).
3. In the present case, plaintiff does not allege that the injury to decedent resulted from a failure to allocate resources by the State Highway Patrol. Instead, plaintiff alleges that Trooper Gardner's deployment of his stop stick constituted an affirmative act that proximately resulted in decedent's death. Trooper Gardner's deployment of his stop stick was not an action or failure to act "limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed," Braswell,330 N.C. at 371, 410 S.E.2d at 901, but was instead an intentional, affirmative act taken in furtherance of a specific goal, to wit, apprehending the suspect. Trooper Gardner's failure to protect decedent from Doyle's evasive maneuver was not in any way the result of a "failure to allocate resources" by the Highway Patrol. Thus, the Full Commission concludes that the public duty doctrine, as set forth in Braswell and as overwhelmingly applied by the courts of North Carolina, does not apply to the facts of the present action. For these reasons, the Full Commission concludes that it is proper to deny defendant's Motion to Dismiss based upon the public duty doctrine.
4. In the alternative to dismissal, defendant has sought summary judgment alleging that the conduct of the officers named did not rise to gross negligence. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1 A-1, Rule 56(c). Defendant alleges that gross negligence is the applicable standard of care in this case and, based *Page 7 
on that standard, there is no factual dispute as to the actions of the officers involved and that those actions do not amount to gross negligence as a matter of law.
5. Summary judgment is appropriate in a negligence action arising out of a high-speed police pursuit where there is no factual dispute as to the actions of the officers involved, and where those actions do not amount to gross negligence as a matter of law. See Norris v. Lambito,135 N.C. App. 288, 520 S.E.2d 113 (1999). In any civil action resulting from the vehicular pursuit of a law violator, the gross negligence standard applies in determining the officer's liability. Parish v. Hill,350 N.C. 231, 238, 513 S.E.2d 547, 551 (1999). North Carolina's standard of gross negligence, with regard to police pursuits, is very high and is rarely met. Eckard v. Smith, 166 N.C. App. 312, 323, 603 S.E.2d 134,142 (2004), aff'd per curiam, 360 N.C. 51, 619 S.E.2d 503 (2005).
6. In Eckard, a defendant law enforcement officer attempted to force a suspect's vehicle to stop by use of a "moving roadblock," which served the similar purpose of decreasing the speed of a suspect's vehicle to a stop as compared to the stop sticks employed in the present case. In determining the applicable standard of care, the Eckard court stated:
 While it appears that our appellate courts have not yet specifically addressed moving roadblocks, there in nothing in our jurisprudence that requires application of a different standard of gross negligence in evaluating facts surrounding a moving roadblock versus other types of police pursuits. Therefore, we analyze moving roadblocks as we would any other type of police pursuit cases.
 The defendants here recognized there was a potential danger to civilians associated with a moving roadblock, just as there is with any pursuit. . . . Our Supreme Court has held that `police officers have a duty to apprehend lawbreakers and society has a strong interest in allowing the police to carry out that duty without fear of becoming insurers for the misdeeds of lawbreakers.' Police officers are required `to act decisively and to show restraint at the same moment,' and their decisions have to be made `in haste, *Page 8 
under pressure, and frequently without the luxury of a second chance.'
Id. at 323, 603 S.E.2d at 141. As in the present case, the actions of the defendant police officer in Eckard occurred immediately ahead of the suspect vehicle and thus not in "pursuit" within the literal meaning of the word. However, the Eckard court considered the actions of the defendant police officer ahead of the suspect vehicle to be part of the pursuit and subject to the same gross negligence standard of care.
7. As the North Carolina Supreme Court held in Parish v. Hill:
 [G]ross negligence has been defined as wanton conduct done with conscious or reckless disregard for the rights and safety of others . . . an act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.
Parish, 350 N.C. at 231, 513 S.E.2d at 547. Based on the totality of the record, the Full Commission concludes that there is no genuine issue of material facts as to the Troopers' actions in deploying the stop sticks in this case. The plaintiff's allegations as they related to Troopers Gardner, Franklin, and Crisp do not rise to the level of an act which is done of wicked purpose, or done needlessly, manifesting reckless indifference in the rights of others. Id. Their conduct was that of officers doing their duty as they were sworn to do. In pursuing an unknown felon, the Troopers developed a plan, chose a safe location with approximately 1,800 feet in sight distance, and continued to properly monitor the vehicular traffic throughout the pursuit. Although the unfortunate events caused by a fleeing suspect on April 14, 2002, ultimately led to the death of decedent, the actions of the Troopers on that day do not rise to the level of gross negligence. Id. For these reasons, the Full Commission concludes that summary judgment in this matter is proper. N.C. Gen. Stat. § 1 A-1, Rule 56(c). *Page 9 
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant's motion to dismiss plaintiff's tort claim upon the application of the public duty doctrine is hereby DENIED.
2. For good cause shown, summary judgment is entered in favor of defendant and this matter is DISMISSED WITH PREJUDICE.
3. Each party shall bear its own costs.
This 8th day of November, 2007.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 10